**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** <u>12-          </u> |
| **v.** | : | **DATE FILED:**<u>         </u> |
| **ANDREW BOGDANOFF** | : | **VIOLATIONS:** |
| **MATTHEW MCMANUS** | | **18 U.S.C. § 371 (conspiracy to commit** |
| **SHAYNE FOWLER** | : | **mail and wire fraud - 1 count)** |
| **JOEL NATHANSON** | | **18 U.S.C. § 1341 (mail fraud - 1 count)** |
| **FRANK VOGEL** | : | **18 U.S.C. § 1343 (wire fraud - 10** |
| **AARON BOGDANOFF** | | **counts)** |
| | : | **18 U.S.C. § 1957 (money laundering -** |
| | | **10 counts)** |
| | : | **18 U.S.C. § 371 (conspiracy to defraud** |
| | | **the United States - 1 count)** |
| | : | **26 U.S.C. § 7206(1) (filing false tax** |
| | | **returns - 8 counts)** |
| | : | **18 U.S.C. § 1505 (obstruction of justice** |
| | | **- 1 count)** |
| | : | **18 U.S.C. § 1001 (false statements to** |
| | | **the federal government - 1 count)** |
| | : | **18 U.S.C. § 2 (aiding and abetting)** |
| | | **Notice of forfeiture** |

# I N D I C T M E N T

## COUNT ONE

(Conspiracy to Commit Mail and Wire Fraud)

**THE GRAND JURY CHARGES THAT:**

## BACKGROUND

At all times material to this indictment:

1.       On or about June 22, 1993, defendant ANDREW BOGDANOFF

incorporated Remington Financial Group, Inc. ("Remington") in Pennsylvania.  From in or about

June 1993 to in or about 2008, Remington maintained an office in Philadelphia, Pennsylvania.

Defendant MATTHEW MCMANUS joined Remington in or about 1994, and later became defendant ANDREW BOGDANOFF's partner and co-owner, and president of Remington.

2.     On or about August 11, 1997, defendants ANDREW BOGDANOFF and MATTHEW MCMANUS registered Remington as a foreign corporation, authorized to conduct business in Arizona. From in or about August 1997 to in or about March 2011, Remington maintained an office in Arizona.

3.     Since its inception in 1993, Remington promoted itself as a company that secured funding for its customers' business projects through what Remington said were its "well-established connections to private and public sources of capital."

4.     Defendant ANDREW BOGDANOFF was the founder and chairman of Remington. In 2011 Remington's website described defendant ANDREW BOGDANOFF as an "expert in commercial real estate financing with over 40 years experience in the industry." BOGDANOFF ran Remington's Arizona office.

5.     Defendant MATTHEW MCMANUS was Remington's president, and ran Remington's Philadelphia office until the fall of 2008. After that time, he and other Remington employees left to run a Remington subsidiary as a separate company.

6.     Defendant SHAYNE FOWLER joined Remington's Arizona office in or about 2003 or 2004. Defendant FOWLER worked at Remington as an account executive, before eventually becoming Remington's chief operating officer, and was responsible, along with defendants ANDREW BOGDANOFF and MATTHEW MCMANUS, for running the company.

7.     Defendant JOEL NATHANSON joined Remington as an account executive in or about 2005, and later was promoted to managing director. From 2007 to 2011,

defendant JOEL NATHANSON was one of the Remington account executives who sold the most "letters of interest" to Remington customers.

8.      Defendant FRANK VOGEL was a Michigan-based broker who referred numerous customers to Remington who paid Remington large advance fees, sometimes exceeding $25,000.

9.      On or about June 18, 2010, defendant ANDREW BOGDANOFF changed Remington's corporate name to Remington Capital, Inc.

10.      On or about May 23, 2002, defendant MATTHEW MCMANUS and S.S., a person known to the Grand Jury, registered Northbridge Capital Management LLC ("Northbridge"), through an attorney, as a Pennsylvania limited liability company.  Remington's website advertised that Northbridge was a lender, available to fund "$2,000,000 to $15,000,000 or greater on select transactions."

**THE SCHEME**

11.      From at least in or about 2005 through and including in or about March 2011, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANDREW BOGDANOFF,
MATTHEW MCMANUS,
SHAYNE FOWLER,
JOEL NATHANSON, and
FRANK VOGEL,**

conspired and agreed, together and with others known and unknown to the grand jury, to commit offenses against the United States, that is, to knowingly execute, and attempt to execute, a scheme to defraud, and to obtain money by means of false and fraudulent pretenses, representations, and promises, and in furtherance of the scheme used the United States mails,

commercial interstate carriers, and interstate wires, in violation of Title 18, United States Code, Sections 1341, 1343, and 1349.

## MANNER AND MEANS

It was a part of the conspiracy that:

12.     Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, SHAYNE FOWLER, JOEL NATHANSON, FRANK VOGEL, and others known and unknown to the Grand Jury, used Remington to fraudulently induce hundreds of people searching for financing for business projects to pay Remington fees in excess of $10,000 each, by falsely claiming that Remington or its "investor" or "lender" was interested in providing financing for the customer's project.

13.     As set up by defendants ANDREW BOGDANOFF and MATTHEW MCMANUS, Remington convinced people searching for financing to send Remington money in exchange for a "letter of interest," commonly referred to as an LOI. This LOI indicated that Remington had a "lender" or "investor" interested in financing the person's project based on terms set out in the LOI. In fact, at the time Remington issued the LOI, no Remington employee had spoken to any funding source and Remington knew that it would be unlikely, if not impossible, to find funding based on the terms in the LOI.

## Remington's Arizona Sales Pitch

14.     In Remington's Arizona office, defendants ANDREW BOGDANOFF, SHAYNE FOWLER, JOEL NATHANSON hired employees, commonly referred to as account executives, to sell Remington's LOI, and to fraudulently induce customers to pay Remington's advance fees. Remington paid the account executives a commission for each up-front fee it

received from a customer. Remington employees referred to this process as the "Arizona pipeline" and referred to these projects as "Arizona deals."

15.     Defendants ANDREW BOGDANOFF and SHAYNE FOWLER provided the account executives leads to solicit and trained the account executives how to find their own customers on the internet.

16.     Defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and JOEL NATHANSON trained the account executives how to speak to customers on the telephone, and directed them to follow a pre-ordained sales process. After having an initial telephone conversation about the project, the account executives were trained to send the customer, via email or facsimile, a Remington intake form to complete. This intake form required the customer to give a brief description of the project for which financing was sought and state how much money the customer needed for the project.

17.     After the customer returned the intake form, defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and JOEL NATHANSON, would determine the terms of the financing Remington's "lender" or "investor" could provide to the customer. The Remington account executive would then input these terms into boilerplate LOI drafted by defendants ANDREW BOGDANOFF and SHAYNE FOWLER and send the victim the customer-specific LOI. With limited exception, every LOI an account executive sent to a customer falsely stated:

> Based on our initial due-diligence and review of information provided to Remington Financial Group, Inc. ("RFG"), RFG is pleased to advise you of our acceptance of the application and of our lender's interest to provide financing as more particularly described hereunder.

The LOI was written to fraudulently lead victims to believe that Remington was either a lender or

had spoken to lenders that had already expressed interest in the customer's project. Neither was true. Additionally, the financing terms Remington included in the LOI were unrealistic and were used solely to induce customers to pay Remington's advance fees.

18.     Defendant ANDREW BOGDANOFF told Remington employees not to "let the truth get in the way" of selling Remington's LOI. Defendant SHAYNE FOWLER provided training materials to account executives instructing them to tell customers that Remington's investor will move on to another project if the customer did not pay the LOI fee. Remington's account executives usually used the phone instead of email to communicate with customers to limit written promises or statements.

19.     In addition to the false and deceptive language in the LOI, to convince a customer to pay Remington's advance fee, Remington's account executives often made additional misrepresentations in phone calls or emails, including:

a.     Account executives told victims that Remington had five investors or lenders interested in their project.

b.     Account executives told victims that Remington was the actual lender for the project.

c.     Account executives told victims that Remington funded or "closed" 80 percent of its deals.

d.     Account executives told victims that their project would get funded once they paid Remington's up-front fee.

e.     Account executives told victims that their project would be funded by Northbridge, Remington's funding partner.

20. Defendants ANDREW BOGDANOFF and SHAYNE FOWLER directed the account executives to send out an LOI for almost every project they discussed with a potential customer. No one at Remington spoke to any lenders, investors, or other "capital sources" prior to sending out the LOI.

21. The Arizona account executives working for defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, and SHAYNE FOWLER did not tell customers that Remington had little success securing lending for projects, that Remington issued an LOI and/or term sheet to almost every customer, that the financing terms in the LOI were completely unrealistic, and the LOI would not result in completed financing.

22. Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, SHAYNE FOWLER, JOEL NATHANSON, and FRANK VOGEL, and others known and unknown to the Grand Jury, intentionally led customers to believe that Remington either was going to fund the loan or had already secured funding for the loan, when in reality, Remington was simply a broker with no dedicated funding sources.

23. Throughout the conspiracy, Remington's Arizona office took fees from hundreds of customers and secured financing for almost no customers.

**Remington's Solicitation Process**

24. Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, SHAYNE FOWLER, and JOEL NATHANSON, and others known and unknown to the Grand Jury, solicited customers to pay Remington's advance fees through Remington's websites, advertising in trade journals, relationships with brokers, and other means.

25. Throughout the conspiracy, defendants ANDREW BOGDANOFF,

MATTHEW MCMANUS, SHAYNE FOWLER, and JOEL NATHANSON, and others known and unknown to the Grand Jury, used various websites to fraudulently induce victims to pay Remington large advance fees. Throughout the conspiracy, these websites contained numerous false and misleading statements.

a. From in or about 2004 to in or about 2007, defendants ANDREW BOGDANOFF and MATTHEW MCMANUS falsely advertised on Remington's website that Remington could fund projects of "$2,000,000 to $15,000,000"directly through Remington's Northbridge Capital Management, LLC, "Real Estate Secured Opportunity Fund I."

b. In or about 2010, defendants ANDREW BOGDANOFF and SHAYNE FOWLER falsely claimed on Remington's website that Remington has "strong connections to hundreds of active funding sources" and "Remington develops and executes financial structures that turn problematic transactions into closings. We offer an extensive network of private and public capital sources to help increase creative financing options - dramatically improving successful close rates for specialized funding and unique financing ventures."

c. In or about 2010, defendants ANDREW BOGDANOFF and SHAYNE FOWLER used Remington's website to advertise an anti-fraud policy and stated falsely that Remington had recently provided information to the Federal Bureau of Investigation and local law enforcement authorities about a suspected email scam. Remington posted this information to ensure that if potential customers used an internet search engine to search for allegations about Remington's fraud they would be directed to Remington's website, rather than third-party internet sources that contained negative information about Remington.

26.     Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, SHAYNE FOWLER, and JOEL NATHANSON, and others known and unknown to the Grand Jury, successfully solicited numerous customers in the United States and other countries by agreeing to pay referring brokers a kickback, or a percentage of the advance fee the customer paid Remington.

27.     Remington paid some referring brokers approximately 20% of the LOI fee a customer paid Remington. Remington paid defendant FRANK VOGEL almost 50% of the $25,000 LOI fee his clients paid Remington.

### The Philadelphia Term Sheet Payment

28.     From the beginning of the conspiracy until in or about the fall of 2008, defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, SHAYNE FOWLER, and JOEL NATHANSON, and others known and unknown to the Grand Jury, used a two-stage fee scheme, where customers were required to pay an initial LOI fee, as described above, and a second fee of $15,000 upon the completion of the first phase of due diligence and issuance of a Remington document called a "term sheet."

29.     Remington's Philadelphia office, run by defendant MATTHEW MCMANUS, was responsible for selling Remington's term sheet to Remington's "Arizona" customers who had already paid the LOI fee.

30.     Defendant MATTHEW MCMANUS drafted the term sheet and defendant SHAYNE FOWLER and Remington employee, Daniel Gura, charged elsewhere, sent the term sheet to Remington customers. The term sheet, like the LOI, was drafted to induce customers to conclude that Remington was either going to finance the project directly or was going to finance

the project through its "lenders" or "investors," once the term sheet fee was paid by the customer. This was false. Remington had no funds and had not shown the project to any "lenders" or "investors." The term sheet typically included the following provisions:

a.    "Based on the completion of our preliminary due diligence and review of documentation submitted along with the signed Letter of Interest, we are pleased to set forth the following terms and conditions to be submitted for approval to RFG [Remington] and its financing sources ("Lender or Investor") to provide financing to a single purpose entity as further defined herein."

b.    "The contemplated Loan may close within 30 days from RFG's issuance and Borrower's execution and return of Firm Commitment (the "Closing"), at the office of RFG, its affiliates, its counsel or title company, as RFG shall designate provided that RFG may, in its sole and absolute discretion, extend the date of Closing for up to 30 days by providing written notice to Borrower."

c.    "This Term Sheet is not a commitment to provide financing at this time. RFG shall ONLY become obligated to make the proposed Loan upon its issuance of a Firm Commitment to Borrower indicating that its evaluation of the Borrower and the collateral and all of the above conditions to the proposed Loan have been satisfied, which is then executed and accepted by Borrower in accordance with other of further terms and conditions that such Firm Commitment may contain."

**The Due Diligence Dodge**

31.    From the beginning of the conspiracy until in or about the fall of 2008, Remington's Philadelphia office, managed by defendant MATTHEW MCMANUS oversaw the

due diligence process for Remington's "Arizona pipeline." From in or about the fall of 2008 to in or about March 2011, Tyler Hufford, charged elsewhere, oversaw Remington's due diligence process. Throughout the conspiracy, defendants ANDREW BOGDANOFF, SHAYNE FOWLER, MATTHEW MCMANUS, and JOEL NATHANSON used the due diligence process to protect Remington against civil and criminal complaints and to convince customers they were at fault when Remington failed to secure funding for their projects.

32.     After a customer paid Remington's fee, Remington employees told customers that they needed to provide personal information and further information about their project so Remington could conduct due diligence. However, defendants ANDREW BOGDANOFF and MATTHEW MCMANUS instructed the Remington employees to use the supposed due diligence inquiry to find problems with the projects so that Remington could find an excuse for why the project did not receive financing. This way Remington could blame its failure to fund the victim's loan on the victim himself or herself. To accomplish this goal:

a.     Remington employees conducting supposed due diligence inquiries were instructed to ask customers to provide documents that Remington knew the customer could not produce.

b.     Remington employees conducting supposed due diligence inquiries were instructed to ask customers to change the project in ways it knew were unacceptable to the customer.

c.     Remington employees conducting supposed due diligence inquiries were instructed to tell customers that the terms of financing in Remington's LOI needed to be dramatically changed.

33.     Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, and others known and unknown to the Grand Jury, designed Remington's due diligence process to frustrate customers and cause them to eventually give up and walk away from the advance fees already paid to Remington. Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, and others known and unknown to the Grand Jury, also used the due diligence process to protect against civil or criminal complaints that Remington was taking advance fees and doing no work.

### Remington's Fake Funding "Approvals"

34.     In some instances, defendant ANDREW BOGDANOFF, and others known and unknown to the Grand Jury, falsely told customers that it found funding for their projects and provided these customers with term sheets or letters of interest from other companies. Remington told customers that these term sheets and/or letters of interest from other companies were "approvals." However, these third-party "approvals" often required additional up-front fees and failed to guarantee financing.

35.     Defendants ANDREW BOGDANOFF and SHAYNE FOWLER advertised these "approvals" as evidence of Remington's success securing financing for projects. For instance, in or about 2010, defendant ANDREW BOGDANOFF fraudulently claimed that Remington had secured over $900 million in lender approvals in 2008 and 2009.

### Splitting up the Fraud Proceeds

36.     The LOI fees paid by Remington customers were split among Remington's owners (defendants ANDREW BOGDANOFF and MATTHEW MCMANUS), the account executives who sold the LOI, and the employee who did the supposed due diligence on the project.

37.     The term sheet fees paid by Remington customers were split among Remington's owners (defendants ANDREW BOGDANOFF and MATTHEW MCMANUS), and the Remington employees who oversaw the term sheet process (Daniel Gura and A.M.).

38.     Some brokers, including defendant FRANK VOGEL and T.H., a person known to the Grand Jury, who referred customers to Remington received a kickback, or a portion of the LOI fee the customer paid to Remington.

39.     Defendant FRANK VOGEL ran a Michigan-based company that acted as a broker for customers seeking financing. Using the LOI described above, defendants SHAYNE FOWLER and FRANK VOGEL induced numerous customers to pay Remington LOI fees of $25,000. In 2007 alone, Remington paid VOGEL over $600,000 in kickbacks.

**Remington's Victims**

40.     Using the scheme described here, defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, SHAYNE FOWLER, and JOEL NATHANSON fraudulently induced hundreds of victims to pay Remington's up-front fees. The following is a brief description of seven victims defrauded by this scheme:

a.     In or about April 2007 California victim M.L. sought $4,700,000 to buy a hotel in Mexico. M.L. exchanged emails with Remington account executive J.C. and told him that M.L. needed the funding by May 12, 2007. On or about April 12, 2007, J.C. told M.L. that Remington was interested in the loan and issued M.L. an LOI requiring M.L. to pay $5,000 to initiate the due diligence process. M.L. paid this fee and provided Remington all the documents it requested to conduct due diligence. On or about April 18, 2007, Daniel Gura sent M.L. a term sheet requesting a $20,000 fee to continue the due diligence process. After the

victim paid this fee, Remington employees, including A.M., told the victim there were significant problems with the deal.  Eventually, J.C. told the victim that Remington had found a lender for the project.  However, this proposed financing amount was approximately half of what was stated in the LOI and term sheet, and thus required the victim to come up with half the money the victim needed, and that J.C. knew the victim did not have.

      b.      California victim ACG sought financing to develop a parcel of land in Arizona.  In or around July 2007, Remington account executive W.H., known to the Grand Jury, sent ACG an LOI signed by defendant ANDREW BOGDANOFF requiring ACG to pay a $6,000 due diligence fee for Remington to secure $5.2 million in financing.  ACG wired Remington this initial $6,000.  After the victim provided Remington information about the project, Remington employee Daniel Gura sent the victim a term sheet requiring payment of a $15,000 fee to complete due diligence for the project.  Remington employee Daniel Gura told the victim and its broker that Remington had cash, could fund the loan internally, and did not need to find an outside source, and that a binding commitment letter would be issued after the $15,000 was paid.  Based on these representations, the victim wired Remington another $15,000.  Soon after this payment, Remington's employees stopped communicating with ACG and did not fund the loan.

      c.      Washington victim M.V. sought $13,475,000 for construction of a condominium project.  In or around April 2008, M.V.'s broker referred the project to Remington, and account executive J.C. issued the victim an LOI requiring a $7,500 due diligence fee.  After paying the $7,500 fee and completing the first round of due diligence, Daniel Gura sent the victim a term sheet requiring an additional $15,000 to complete due diligence.  On or about June

3, 2008, the victim wired Remington $15,000.  Subsequently, Remington employees J.C., Daniel Gura, and Tyler Hufford stopped responding to M.V.'s telephone calls or emails.

        d.      New Jersey victim S.B. sought $27,510,000 million in financing for a Camden real-estate project.  In or around April 2009, a broker referred S.B. to Remington. S.B. began speaking to defendant JOEL NATHANSON and Remington account executive B.S., who sent the victim an LOI stating that Remington's lender was interested in providing financing, and gave the victim the impression that once the due diligence fee of $12,500 was paid, his project would receive financing.  After making the due diligence payment, the victim dealt with Remington due diligence analyst M.S. who said that to qualify for financing the victim would need to obtain 65% pre-sales for the development, and demonstrate a net worth of 10% of the financing, among other things.   Thereafter Remington's employees stopped communicating with the victim and refused to refund the $12,500 due diligence payment.

        e.      In or around February 2010, Florida victim I.G. sought $1.6 million to acquire a building.  The victim's broker began speaking to Remington employee C.D. about the project.  C.D. sent the victim and the broker an LOI requiring the victim to pay a due diligence fee of $15,000, and assured the victim's broker that it would be easy for Remington to obtain financing for the project.  After wiring Remington $15,000, Remington employees told the victim's broker that Remington could not finance the project under the original terms of the LOI and offered revised terms that Remington knew the victim could not meet.  The broker spoke to C.D. and asked him for proof of any project that Remington had closed.  C.D. told the broker that he had tried to find proof, but was unable to do so.  C.D. also told the broker that he had worked for Remington for four or five months and none of the deals he had worked on had

closed, and that he was just trying to make a living.

f.      Mississippi victim C.R. was looking for $2.7 million in financing for a real estate project.  In or around November 2010, C.R. filled out an application on Remington's website and was soon contacted by Remington account executive A.N.  After speaking to A.N. and giving him basic information about the project, A.N. emailed the victim a Remington LOI offering its services to find financing for the project upon payment of a $16,000 up-front fee.  The victim told A.N. that she was unable to pay the entire $16,000 fee, and on or about November 17, 2010, A.N. sent C.R. an "Extension Request" letter, requiring a $2,000 deposit to extend the LOI for 30 days.  A.N. also stated in an email: "The investment fund currently has 2.7M USD on hold . . . the fund manager has advised that he will take the money allocated toward [your project] and take the funds off of hold status.  He will look for another project in which to invest."  Fearful that the funds "on hold" for her project would be released, the victim wired $2,000 to Remington's Bank of America account on or about November 17, 2010.  The victim did not send the balance of the money for the LOI.

g.      Pennsylvania victim J.D. ran a company that needed $22 million to finance a solar energy "farm."  In late 2010 J.D. began discussing his project with defendant JOEL NATHANSON who told J.D. that he had run the project by Remington's funding sources and just needed a $16,000 up-front payment to do the underwriting and put the package together.  Defendant JOEL NATHANSON told the victim that the lenders had a time-limit on the project.  The victim paid Remington $2,000 to extend Remington's offer an additional two-weeks and then paid the full requested amount of $16,000.  Subsequently, defendant JOEL NATHANSON and Remington induced the victim's company to send another due diligence fee of $8,500 to

fund another project. After the victim paid Remington the up-front fees, none of the five lending sources claimed by Remington to be lined up for the project materialized. Remington did not offer any financing to J.D.

### Extent of Remington's Fraud

41.     Through the execution of this scheme, Remington's Arizona employees induced more than 200 victims per year to pay Remington's up-front fees.

       a.     In 2007 alone, approximately 300 victims paid Remington an LOI fee of between $6,000 and $25,000, and approximately 200 of these victims paid Remington a term sheet fee of $15,000.

       b.     In 2008, approximately 500 victims paid Remington an LOI fee of between $6,000 and $25,000, and approximately 300 of these victims paid Remington a term sheet fee of $15,000.

42.     From the beginning of 2006 to the end of 2008, defendants SHAYNE FOWLER and FRANK VOGEL sold LOIs to approximately 50 customers defendant VOGEL referred to Remington. Most of these customers paid Remington an LOI fee of $25,000. Of this $25,000, Remington paid defendant VOGEL approximately forty-five percent and designated ten percent for a "liability" fund. Defendant SHAYNE FOWLER received more than twenty percent of the LOI fees VOGEL helped Remington secure.

43.     Defendants ANDREW BOGDANOFF and MATTHEW MCMANUS filed a corporate tax return for Remington for 2005 stating that Remington had gross receipts exceeding $2,800,000.

44.     Defendants ANDREW BOGDANOFF and MATTHEW MCMANUS

filed a corporate tax return for Remington for 2006 stating that Remington had gross receipts exceeding $8,400,000.

45.     Defendants ANDREW BOGDANOFF and MATTHEW MCMANUS filed a corporate tax return for Remington for 2007 stating that Remington had gross receipts exceeding $12,000,000.

46.     Defendant ANDREW BOGDANOFF filed a corporate tax return for Remington for 2008 stating that Remington had gross receipts exceeding $10,000,000.

47.     Defendant ANDREW BOGDANOFF filed a corporate tax return for Remington for 2009 stating that Remington had gross receipts exceeding $4,400,000.

## OVERT ACTS

In furtherance of this conspiracy, the defendants committed the following overt acts, among others, in the Eastern District of Pennsylvania, and elsewhere:

1.     From approximately 2004 to approximately 2007, defendants ANDREW BOGDANOFF and MATTHEW MCMANUS advertised on Remington's website its ability to finance multi-million dollar projects directly through a fund it controlled called the Northbridge Capital Management, LLC, "Real Estate Secured Opportunity Fund I." However, Northbridge, a company formed by defendant MATTHEW MCMANUS had limited resources and no ability to fund large loans as Remington claimed.

2.     On or about February 16, 2006, defendant ANDREW BOGDANOFF sent a letter to a prospective customer falsely stating that Remington's "Northbridge Capital Partner, LLC fund is made of several private lenders."

3.     On or about January 29, 2007, Remington victim G.D. returned a signed

term sheet to defendant ANDREW BOGDANOFF via facsimile from Massachusetts to Arizona, based on false representations made by defendants SHAYNE FOWLER and FRANK VOGEL that Remington would finance G.D.'s project through its Northbridge Fund.

4.      On or about April 30, 2007, defendants ANDREW BOGDANOFF and MATTHEW MCMANUS faxed a "Commitment Letter" to a Remington victim stating that "Northbridge Capital has approved your request for a $46,900,000 loan" and required the victim to pay Remington an up-front fee of $469,000 to secure this commitment. However, Northbridge had no money and no ability to fund this loan.

5.      On or about August 1, 2007, defendant SHAYNE FOWLER directed Remington account executive M.W., a person known to the Grand Jury, to send an email to a broker working with a Remington customer falsely stating:

> I've looked into [Remington's] previous movie deals. As company policy we do not give out contact information for previous deals we have completed to protect the privacy of our clients. . . . I did look over our past deals, and saw we have completed six movies in the last five years, and 20 movies over the history of Remington. The budgets of these films have ranged from 1.5MM to 85MM. Let me know if you have any questions.

Remington did not finance any movie deals, though it sold LOI for a number of movie deals.

6.      On or about November 21, 2007, during a conference call held to convince Remington customers to pay Remington's LOI fee, defendant JOEL NATHANSON falsely stated that Remington represented two financial sources, Bluestone and Northbridge Capital. Neither Bluestone nor Northbridge had the capability to provide financing.

7.      On or about January 17, 2008, Remington employee Daniel Gura emailed a term sheet to Remington customer T.A. who defendant JOEL NATHANSON told that Remington represented two funding sources – Bluestone and Northbridge – who had already

reviewed T.A.'s project. Defendant JOEL NATHANSON's representation was false. Neither Bluestone nor Northbridge were funding sources.

8.    On or about May 5, 2008, Remington victim S.E. wired $15,000 from a bank account in Missouri to Remington's Home National Bank account in Arizona to pay the due diligence fee requested by defendants SHAYNE FOWLER and FRANK VOGEL, who told S.E. that as long as S.E. did not shop the project to other lenders Remington would secure financing for the project.

9.    On or about October 30, 2008, defendant ANDREW BOGDANOFF sent a letter to Illinois Secretary of State, Securities Division, stating that:

> Remington generally provides advisory and financial services to businesses that have been unsuccessful . . . in securing financing from other sources. . . . Remington advises these commercial clients . . . on the reasons they may have been unable to secure financing and how to develop strategies for better positioning their businesses to qualify for the financing they seek. These clients generally are referred to Remington by their loan brokers for Remington's services. Remington does not receive any compensation from the referring loan brokers, nor does it pay the referring loan brokers any compensation.

This letter was false in two respects. First, Remington's customers did not pay it for advice "on the reasons they may have been unable to secure financing." Customers paid Remington because Remington said that its funding sources are interested in funding the customer's project. Second, Remington did pay brokers like defendant FRANK VOGEL kickbacks for referring customers.

10.    On or about May 4, 2010, defendants ANDREW BOGDANOFF and SHAYNE FOWLER posted information on the Remington website stating that from 2008 to 2009, Remington "secured $953.7 million in lender approvals for transactions involving industrial, hospitality, land, multi-family, office, and retail projects" and "lender approvals are continuing in 2010." This statement was entirely misleading. Most of these "lender approvals"

were nothing more than letters of intent and similar non-binding offers from companies that had no independent funding, but companies like Remington that sought advance fees to act as a broker.

11.     On or about May 12, 2010, defendant ANDREW BOGDANOFF posted a press release on Remington's website falsely stating that Remington had recently "alerted the FBI and other law enforcement agencies that an email scam is falsely using Remington's name to gain private information that may be used in identity theft."

12.     On or about June 18, 2010, defendant ANDREW BOGDANOFF changed Remington's name from "Remington Financial Group" to "Remington Capital, Inc."

13.     On or about July 12, 2010, a Remington account executive trained by defendants ANDREW BOGDANOFF and SHAYNE FOWLER, G.W., a person known to the Grand jury, sent an email to a prospective Remington victim stating that if the victim did not pay Remington's due diligence fee, the investor for the victim's project was going to withdraw the offer.  This email was false and was meant solely to induce the customer to pay Remington's fee. Remington had no investor that had agreed to fund this project.

14.     On or about November 12, 2010, Remington victim J.D. wired $14,000 from a bank account in Pennsylvania to Remington's Bank of America account in Arizona to pay the due diligence fee requested by defendant JOEL NATHANSON who falsely stated that Remington had run the project by its funding sources, but that Remington's lenders had a time limit on their offer.

15.     On or about November 17, 2010, a Remington account executive trained by defendants ANDREW BOGDANOFF and SHAYNE FOWLER, A.N., a person known to the

Grand Jury, sent an email to a prospective Remington victim stating that if the victim did not send Remington money to extend the LOI for the project, the money that was allocated for the victim's project would be allocated to another project. This email was false and was meant solely to induce the customer to pay Remington's fee. Remington had no investor that had allocated money for this project. Defendants ANDREW BOGDANOFF and SHAYNE FOWLER created this tactic for Remington's account executives to use.

16.     On or about January 4, 2011, A.N., sent an email to a prospective Remington customer falsely stating, "We [Remington] close about 70% of LOIs issued" and that "in the last 4 years alone [Remington] has closed almost $4 billion in financing for top tier businesses nationwide." These assertions were false.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

### THE SCHEME

2.    From in or about 2005, through in or about March 2011, defendant

**ANDREW BOGDANOFF**

devised and intended to devise a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

3.    Defendant ANDREW BOGDANOFF and others known and unknown to the Grand Jury, used Remington to defraud customers seeking financing for business projects throughout the United States and foreign countries.

4.    Defendant ANDREW BOGDANOFF, and others known and unknown to the Grand Jury, induced customers to pay large advance fees by, among other falsehoods, falsely representing that Remington had investors and lenders who were interested in the customer's project.

5.    On or about the date listed below, in the Eastern District of Pennsylvania, Northern District of Illinois, and elsewhere, defendant

**ANDREW BOGDANOFF,**

for the purpose of executing the scheme and aiding and abetting its execution, deposited and knowingly caused to be delivered by commercial interstate carrier according to the directions

thereon the item listed below:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Count Two | October 30, 2008 | A letter to the Illinois Secretary of State denying that Remington acts as a loan broker and denying that Remington pays referring brokers any compensation. |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

### THE SCHEME

2. From in or about 2005, through in or about March 2011, defendants

**ANDREW BOGDANOFF,
MATTHEW MCMANUS,
SHAYNE FOWLER, and
FRANK VOGEL**

devised and intended to devise a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

3. Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, SHAYNE FOWLER, and FRANK VOGEL, and others known and unknown to the Grand Jury, used Remington to defraud customers seeking financing for business projects throughout the United States and foreign countries.

4. Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS, SHAYNE FOWLER, and FRANK VOGEL, and others known and unknown to the Grand Jury, induced customers to pay large advance fees by, among other falsehoods, falsely representing that Remington had investors and lenders who were interested in the customer's project.

5. On or about the date listed below, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANDREW BOGDANOFF,**

**MATTHEW MCMANUS,**
**SHAYNE FOWLER, and**
**FRANK VOGEL,**

for the purpose of executing the scheme and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| Count Three | January 29, 2007 | Remington victim G.D. returned a signed term sheet to defendant ANDREW BOGDANOFF via facsimile from Massachusetts to Arizona, based on false representations made by defendants SHAYNE FOWLER and FRANK VOGEL that Remington would finance G.D.'s project through its Northbridge Fund. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs One through Ten and Twelve through Forty-Seven and Overt

Acts One through Sixteen of Count One of this indictment are incorporated here.

### THE SCHEME

2.      From in or about 2005, through in or about March 2011, defendants

**ANDREW BOGDANOFF, and**
**MATTHEW MCMANUS**

devised and intended to devise a scheme to defraud and to obtain money by means of false and

fraudulent pretenses, representations and promises.

### MANNER AND MEANS

3.      Defendants ANDREW BOGDANOFF and MATTHEW MCMANUS, and

others known and unknown to the Grand Jury, used Remington to defraud customers seeking

financing for business projects throughout the United States and foreign countries.

4.      Defendants ANDREW BOGDANOFF and MATTHEW MCMANUS, and

others known and unknown to the Grand Jury, induced customers to pay large advance fees by,

among other falsehoods, falsely representing that Remington had investors and lenders who were

interested in the customer's project.

5.      On or about the date listed below, in the Eastern District of Pennsylvania,

and elsewhere, defendants

**ANDREW BOGDANOFF, and**
**MATTHEW MCMANUS,**

for the purpose of executing the scheme and aiding and abetting its execution, caused to be

transmitted by means of wire communication in interstate commerce the signals and sounds

described below:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Count Four | April 30, 2007 | A Commitment Letter sent by facsimile from Philadelphia, Pennsylvania to California stating that Northbridge Capital LLC would fund a loan for $46,900,000. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

1. Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

### THE SCHEME

2. From in or about 2005, through in or about March 2011, defendants

**ANDREW BOGDANOFF, and
SHAYNE FOWLER**

devised and intended to devise a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

3. Defendants ANDREW BOGDANOFF and SHAYNE FOWLER, and others known and unknown to the Grand Jury, used Remington to defraud customers seeking financing for business projects throughout the United States and foreign countries.

4. Defendants ANDREW BOGDANOFF and SHAYNE FOWLER, and others known and unknown to the Grand Jury, induced customers to pay large advance fees by, among other falsehoods, falsely representing that Remington had investors and lenders who were interested in the customer's project.

5. On or about the date listed below, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANDREW BOGDANOFF, and
SHAYNE FOWLER,**

for the purpose of executing the scheme and aiding and abetting its execution, caused to be

transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Count Five | August 1, 2007 | Defendant SHAYNE FOWLER directed Remington employee M.W., to send an email from Arizona to a broker for two California victims falsely stating that Remington has financed six movies over the last five years and twenty movies in its history with budgets ranging from $1.5 million to $85 million. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs One through Ten and Twelve through Forty-Seven and Overt

Acts One through Sixteen of Count One of this indictment are incorporated here.

### THE SCHEME

2.      From in or about 2005, through in or about March 2011, defendants

**ANDREW BOGDANOFF,**
**MATTHEW MCMANUS,**
**SHAYNE FOWLER, and**
**JOEL NATHANSON**

devised and intended to devise a scheme to defraud and to obtain money by means of false and

fraudulent pretenses, representations and promises.

### MANNER AND MEANS

3.      Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS,

SHAYNE FOWLER, and JOEL NATHANSON, and others known and unknown to the Grand

Jury, used Remington to defraud customers seeking financing for business projects throughout

the United States and foreign countries.

4.      Defendants ANDREW BOGDANOFF, MATTHEW MCMANUS,

SHAYNE FOWLER, and JOEL NATHANSON, and others known and unknown to

the Grand Jury, induced customers to pay large advance fees by, among other falsehoods, falsely

representing that Remington had investors and lenders who were interested in the customer's

project.

5.      On or about the date listed below, in the Eastern District of Pennsylvania,

and elsewhere, defendants

**ANDREW BOGDANOFF,**
**MATTHEW MCMANUS,**
**SHAYNE FOWLER, and**
**JOEL NATHANSON,**

for the purpose of executing the scheme and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| Count Six | January 17, 2008 | Remington employee Daniel Gura emailed a term sheet from Philadelphia, Pennsylvania to Remington customer T.A. whom defendant JOEL NATHANSON told that Remington represented two funding sources – Bluestone and Northbridge – who had already reviewed T.A.'s project. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.    Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

### THE SCHEME

2.    From in or about 2005, through in or about March 2011, defendants

**ANDREW BOGDANOFF,**
**SHAYNE FOWLER, and**
**FRANK VOGEL**

devised and intended to devise a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

3.    Defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and FRANK VOGEL, and others known and unknown to the Grand Jury, used Remington to defraud customers seeking financing for business projects throughout the United States and foreign countries.

4.    Defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and FRANK VOGEL, and others known and unknown to the Grand Jury, induced customers to pay large advance fees by, among other falsehoods, falsely representing that Remington had investors and lenders who were interested in the customer's project.

5.    On or about the date listed below, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANDREW BOGDANOFF,**
**SHAYNE FOWLER, and**

-33-

**FRANK VOGEL,**

for the purpose of executing the scheme and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Count Seven | May 5, 2008 | Remington victim S.E. wired $15,000 from a bank account in Missouri to Remington's Home National Bank account in Arizona to pay the due diligence fee requested by defendants SHAYNE FOWLER and FRANK VOGEL. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT EIGHT

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

### THE SCHEME

      2.      From in or about 2005, through in or about March 2011, defendants

**ANDREW BOGDANOFF, and
SHAYNE FOWLER**

devised and intended to devise a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

      3.      Defendants ANDREW BOGDANOFF and SHAYNE FOWLER, and others known and unknown to the Grand Jury, used Remington to defraud customers seeking financing for business projects throughout the United States and foreign countries.

      4.      Defendants ANDREW BOGDANOFF and SHAYNE FOWLER, and others known and unknown to the Grand Jury, induced customers to pay large advance fees by, among other falsehoods, falsely representing that Remington had investors and lenders who were interested in the customer's project.

      5.      On or about the date listed below, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANDREW BOGDANOFF, and
SHAYNE FOWLER,**

for the purpose of executing the scheme and aiding and abetting its execution, caused to be

transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Count Eight | September 30, 2009 | Remington published its "Fraud Policy" on its website in Arizona. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

### THE SCHEME

2.     From in or about 2005, through in or about March 2011, defendants

**ANDREW BOGDANOFF,**
**SHAYNE FOWLER, and**
**FRANK VOGEL**

devised and intended to devise a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

3.     Defendants ANDREW BOGDANOFF and SHAYNE FOWLER, and others known and unknown to the Grand Jury, used Remington to defraud customers seeking financing for business projects throughout the United States and foreign countries.

4.     Defendants ANDREW BOGDANOFF and SHAYNE FOWLER, and others known and unknown to the Grand Jury, induced customers to pay large advance fees by, among other falsehoods, falsely representing that Remington had investors and lenders who were interested in the customer's project.

5.     On or about the date listed below, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANDREW BOGDANOFF, and**
**SHAYNE FOWLER,**

for the purpose of executing the scheme and aiding and abetting its execution, caused to be

transmitted by means of wire communication in interstate commerce the signals and sounds

described below:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Count Nine | July 12, 2010 | Remington employee G.W., trained by defendants ANDREW BOGDANOFF and SHAYNE FOWLER on what to say to customers to sell LOI, sent an email from Arizona to a potential Remington customer stating that if the due diligence payment was not made soon, the lender wanted to close the file. |

In violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS TEN THROUGH TWELVE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

### THE SCHEME

2.      From in or about 2005, through in or about March 2011, defendants

**ANDREW BOGDANOFF,**
**SHAYNE FOWLER, and**
**JOEL NATHANSON**

devised and intended to devise a scheme to defraud and to obtain money by means of false and fraudulent pretenses, representations and promises.

### MANNER AND MEANS

3.      Defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and JOEL NATHANSON, and others known and unknown to the Grand Jury, used Remington to defraud customers seeking financing for business projects throughout the United States and foreign countries.

4.      Defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and JOEL NATHANSON, and others known and unknown to the Grand Jury, induced customers to pay large advance fees by, among other falsehoods, falsely representing that Remington had investors and lenders who were interested in the customer's project.

5.      On or about the dates listed below, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANDREW BOGDANOFF,**
**SHAYNE FOWLER, and**

**JOEL NATHANSON,**

for the purpose of executing the scheme and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| Count Ten | November 12, 2010 | Remington victim J.D. wired $14,000 from a bank account in Pennsylvania to Remington's Bank of America account in Arizona to pay the due diligence fee requested by defendant JOEL NATHANSON. |
| Count Eleven | November 17, 2010 | Remington employee A.N. trained by defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and JOEL NATHANSON, on what to say to customers to sell LOI, sent an email from Arizona to Mississippi victim C.R. stating that if she did not pay Remington's due diligence fee by 4:00 p.m. on November 18, 2010, the funds set aside for her project would be reallocated to another investment. |
| Count Twelve | January 4, 2011 | Remington employee A.N. trained by defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and JOEL NATHANSON, sent an email from Arizona to Mississippi victim C.R. stating that Remington closes about 70 percent of the letters of interest it issues. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

<u>**COUNTS THIRTEEN THROUGH SIXTEEN**</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

        1.      Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

        2.      On or about the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendant

**ANDREW BOGDANOFF**

knowingly engaged in, and aided, abetted, and willfully caused, monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, described more fully below, and such property was derived from a specified unlawful activity, that is mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Count Thirteen | June 4, 2007 | Defendant ANDREW BOGDANOFF directed Home National Bank to wire $166,282.77 from Remington's account to use as a settlement payment to purchase real estate. |
| Count Fourteen | June 27, 2007 | Defendant ANDREW BOGDANOFF directed Home National Bank to make an electronic fund transfer of $239,588.02 from Remington's Home National Bank to purchase real estate. |
| Count Fifteen | April 9, 2008 | Defendant ANDREW BOGDANOFF directed Home National Bank to wire $127,073.08 from Remington's Home National Bank account to purchase real estate. |
| Count Sixteen | June 9, 2008 | Defendant ANDREW BOGDANOFF wrote a check for $75,000 drawn on Remington's Home National Bank account used to pay defendant BOGDANOFF's American Express bill. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS SEVENTEEN THROUGH NINETEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.       Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

2.       On or about the dates set forth below, in the Eastern District of Pennsylvania, defendant

## MATTHEW MCMANUS

knowingly engaged in, and aided, abetted, and willfully caused, monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, described more fully below, and such property was derived from a specified unlawful activity, that is mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343:

| COUNT | DATE | DESCRIPTION |
|---|---|---|
| Count Seventeen | June 5, 2007 | Defendant MATTHEW MCMANUS deposited a check for $50,000 drawn on Remington's Republic First bank account. |
| Count Eighteen | August 16, 2007 | Defendant MATTHEW MCMANUS deposited a check for $40,000 drawn on Remington's Republic First bank account. |
| Count Nineteen | January 21, 2008 | Defendant MATTHEW MCMANUS deposited three checks totaling $36,619.89 drawn on Remington's Home National Bank account. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNTS TWENTY THROUGH TWENTY-TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs One through Ten and Twelve through Forty-Seven and Overt Acts One through Sixteen of Count One of this indictment are incorporated here.

2.      On or about the dates set forth below, in the Eastern District of Pennsylvania and elsewhere, defendant

**SHAYNE FOWLER**

knowingly engaged in, and aided, abetted, and willfully caused, monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, described more fully below, and such property was derived from a specified unlawful activity, that is mail and wire fraud, in violation of Title 18, United States Code, Sections 1341, 1343:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| Count Twenty | June 29, 2007 | Defendant SHAYNE FOWLER wired $116,920.10 from Remington's Home National Bank account to purchase real estate in Arizona. |
| Count Twenty-One | April 9, 2008 | Defendant SHAYNE FOWLER wired $54,513.09 from Remington's Home National Bank account to purchase a vehicle in Arizona. |
| Count Twenty-Two | July 14, 2008 | Defendant SHAYNE FOWLER wrote a $25,907.50 check drawn on Remington's Home National Bank account to purchase a vehicle in Arizona. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT TWENTY-THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

### BACKGROUND

1.      Paragraphs One through Ten and Twelve through Forty-Seven of Count One of this indictment are incorporated here.

2.      Defendant AARON BOGDANOFF is defendant ANDREW BOGDANOFF's son and was employed sporadically by Remington.

3.      From in or about October 2007 to in or about June 2009, N.S., a person known to the Grand Jury, worked for Remington as a bookkeeper and administrative assistant.

4.      From in or about June 2009 through in or about March 2011, N.H. worked for Remington as an bookkeeper and administrative assistant.

### THE SCHEME

5.      Between in or about 2007 and in or about 2010, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANDREW BOGDANOFF,
AARON BOGDANOFF, and
SHAYNE FOWLER**

conspired and agreed, together and with others known and unknown to the Grand Jury, to defraud the United States, by willfully impeding, impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment and collection of income taxes from defendants ANDREW BOGDANOFF, AARON BOGDANOFF, and SHAYNE FOWLER for the calendar years 2006, 2007, 2008, and 2009.

## MANNER AND MEANS

It was part of the conspiracy that:

6.       Defendants ANDREW BOGDANOFF and SHAYNE FOWLER
controlled Remington's bank account at Home National Bank in Arizona.  Remington used this
account to receive funds from Remington clients and pay Remington's bills.

7.       Defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and
AARON BOGDANOFF directed N.S. and N.H. to pay the personal expenses of defendants
ANDREW BOGDANOFF, SHAYNE FOWLER, and AARON BOGDANOFF using funds from
Remington's bank accounts, including the account at Home National Bank.

8.       Defendants ANDREW BOGDANOFF directed N.S. and N.H. to include
 defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and AARON BOGDANOFF's
personal expenses, such as mortgage, auto, and credit card payments, as Remington business
expenses.

9.       Defendants ANDREW BOGDANOFF directed N.S. and N.H. to create
false entries in Remington's Quickbooks files to conceal Remington's payment of these personal
expenses from Remington's accountants, so that defendants ANDREW BOGDANOFF,
SHAYNE FOWLER, and AARON BOGDANOFF would not be responsible for income tax
owed on these personal expenses.

10.       As a result of this fraudulent activity, Remington's tax preparer
unwittingly drafted and filed false corporate returns that included large business deductions for
what he thought were business expenses but were actually personal expenses for defendants
ANDREW BOGDANOFF, SHAYNE FOWLER, and AARON BOGDANOFF.

11.     As a result of this fraudulent activity, the tax preparer for defendants ANDREW BOGDANOFF and AARON BOGDANOFF unwittingly drafted and filed false individual returns that understated the income of defendants ANDREW BOGDANOFF and AARON BOGDANOFF.

## OVERT ACTS

In furtherance of the conspiracy, in the Eastern District of Pennsylvania, defendants ANDREW BOGDANOFF, SHAYNE FOWLER, and AARON BOGDANOFF, and others known to the grand jury committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1.     On or about October 21, 2007, defendant AARON BOGDANOFF filed with the Internal Revenue Service a materially false and fraudulent 2006 form 1040 federal income tax return.

2.     On or about October 22, 2007, defendant ANDREW BOGDANOFF filed with the Internal Revenue Service a materially false and fraudulent year 2006 form 1040 federal income tax return.

3.     On or about April 21, 2008, defendant SHAYNE FOWLER filed with the Internal Revenue Service a materially false and fraudulent 2007 form 1040 federal income tax return.

4.     On or about September 11, 2008, defendant ANDREW BOGDANOFF filed with the Internal Revenue Service a materially false and fraudulent 2007 form 1040 federal income tax return.

5.     On or about October 15, 2008, defendant AARON BOGDANOFF filed

with the Internal Revenue Service a materially false and fraudulent 2007 form 1040 federal income tax return.

6.        On or about October 13, 2009, defendant ANDREW BOGDANOFF filed with the Internal Revenue Service a materially false and fraudulent 2008 form 1040 federal income tax return.

7.        On or about October 13, 2009, defendant AARON BOGDANOFF filed with the Internal Revenue Service a materially false and fraudulent 2008 form 1040 federal income tax return.

8.        On or about October 10, 2010, defendant AARON BOGDANOFF filed with the Internal Revenue Service a materially false and fraudulent 2009 form 1040 federal income tax return.

9.        On or about October 14, 2010, defendant ANDREW BOGDANOFF filed with the Internal Revenue Service a materially false and fraudulent 2009 form 1040 federal income tax return.

All in violation of Title 18, United States Code, Section 371 and Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs One through Four and Six through Eleven and Overt Act Two of Count Twenty-Three are incorporated here.

2.      On or about October 22, 2007, in the Eastern District of Pennsylvania, defendant

### ANDREW BOGDANOFF,

resident of Arizona, willfully made and subscribed a United States income tax return, Form 1040, for the calendar year 2006, which was verified by a written declaration that it was made under the penalty of perjury and filed with the Director, Internal Revenue Service Center, at Philadelphia, Pennsylvania, which defendant ANDREW BOGDANOFF did not believe to be true and correct as to every material matter, in that the return reported adjusted gross income of $376,244 when, as defendant BOGDANOFF knew, that his adjusted gross income was approximately $673,163.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     Paragraphs One through Four and Six through Eleven and Overt Act One of Count Twenty-Three are incorporated here.

      2.     On or about October 21, 2007, in the Eastern District of Pennsylvania, defendant

**AARON BOGDANOFF,**

resident of Arizona, willfully made and subscribed a United States income tax return, Form 1040, for the calendar year 2006, which was verified by a written declaration that it was made under the penalty of perjury and filed with the Director, Internal Revenue Service Center, at Philadelphia, Pennsylvania, which defendant AARON BOGDANOFF did not believe to be true and correct as to every material matter, in that the return reported adjusted gross income of $25,707 when, as defendant BOGDANOFF knew, that his adjusted gross income was approximately $98,463.

      In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-SIX

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs One through Four and Six through Eleven and Overt Act Four of Count Twenty-Three are incorporated here.

2.     On or about September 11, 2008, in the Eastern District of Pennsylvania, defendant

**ANDREW BOGDANOFF,**

resident of Arizona, willfully made and subscribed a United States income tax return, Form 1040, for the calendar year 2007, which was verified by a written declaration that it was made under the penalty of perjury and filed with the Director, Internal Revenue Service Center, at Philadelphia, Pennsylvania, which defendant ANDREW BOGDANOFF did not believe to be true and correct as to every material matter, in that the return reported adjusted gross income of $565,842 when, as defendant BOGDANOFF knew, that his adjusted gross income was approximately $1,412,677.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs One through Four and Six through Eleven and Overt Act Five of Count Twenty-Three are incorporated here.

2.      On or about October 15, 2008, in the Eastern District of Pennsylvania, defendant

**AARON BOGDANOFF,**

resident of Arizona, willfully made and subscribed a United States income tax return, Form 1040, for the calendar year 2007, which was verified by a written declaration that it was made under the penalty of perjury and filed with the Director, Internal Revenue Service Center, at Philadelphia, Pennsylvania, which defendant AARON BOGDANOFF did not believe to be true and correct as to every material matter, in that the return reported adjusted gross income of $22,662 when, as defendant BOGDANOFF knew, that his adjusted gross income was approximately $440,936.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-EIGHT

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.       Paragraphs One through Four and Six through Eleven and Overt Act Six of Count Twenty-Three are incorporated here.

       2.       On or about October 13, 2009, in the Eastern District of Pennsylvania, defendant

### ANDREW BOGDANOFF,

resident of Arizona, willfully made and subscribed a United States income tax return, Form 1040, for the calendar year 2008, which was verified by a written declaration that it was made under the penalty of perjury and filed with the Director, Internal Revenue Service Center, at Philadelphia, Pennsylvania, which defendant ANDREW BOGDANOFF did not believe to be true and correct as to every material matter, in that the return reported adjusted gross income of $216,624 when, as defendant BOGDANOFF knew, that his adjusted gross income was approximately $987,569.

       In violation of Title 26, United States Code, Section 7206(1).

## COUNT TWENTY-NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.　　Paragraphs One through Four and Six through Eleven and Overt Act Seven of Count Twenty-Three are incorporated here.

2.　　On or about October 13, 2009, in the Eastern District of Pennsylvania, defendant

**AARON BOGDANOFF,**

resident of Arizona, willfully made and subscribed a United States income tax return, Form 1040, for the calendar year 2008, which was verified by a written declaration that it was made under the penalty of perjury and filed with the Director, Internal Revenue Service Center, at Philadelphia, Pennsylvania, which defendant AARON BOGDANOFF did not believe to be true and correct as to every material matter, in that the return reported adjusted gross income of $11,007 when, as defendant BOGDANOFF knew, that his adjusted gross income was approximately $227,132.

In violation of Title 26, United States Code, Section 7206(1).

## COUNT THIRTY

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs One through Four and Six through Eleven and Overt Act Nine of Count Twenty-Three are incorporated here.

      2.      On or about October 14, 2010, in the Eastern District of Pennsylvania, defendant

**ANDREW BOGDANOFF,**

resident of Arizona, willfully made and subscribed a United States income tax return, Form 1040, for the calendar year 2009, which was verified by a written declaration that it was made under the penalty of perjury and filed with the Director, Internal Revenue Service Center, at Philadelphia, Pennsylvania, which defendant ANDREW BOGDANOFF did not believe to be true and correct as to every material matter, in that the return reported adjusted gross income of $-24,808 when, as defendant BOGDANOFF knew, that his adjusted gross income was approximately $295,470.

      In violation of Title 26, United States Code, Section 7206(1).

## COUNT THIRTY-ONE

**THE GRAND JURY FURTHER CHARGES THAT:**

        1.      Paragraphs One through Four and Six through Eleven and Overt Act Eight of Count Twenty-Three are incorporated here.

        2.      On or about October 10, 2010, in the Eastern District of Pennsylvania, defendant

### AARON BOGDANOFF,

resident of Arizona, willfully made and subscribed a United States income tax return, Form 1040, for the calendar year 2009, which was verified by a written declaration that it was made under the penalty of perjury and filed with the Director, Internal Revenue Service Center, at Philadelphia, Pennsylvania, which defendant AARON BOGDANOFF did not believe to be true and correct as to every material matter, in that the return reported adjusted gross income of $25,272 when, as defendant BOGDANOFF knew, that his adjusted gross income was approximately $154,773.

        In violation of Title 26, United States Code, Section 7206(1).

## COUNT THIRTY-TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs One through Ten and Twelve through Forty-Seven of Count One of this indictment are incorporated here.

      2.      On or about March 18, 2011, in Philadelphia, in the Eastern District of Pennsylvania, defendant

## MATTHEW MCMANUS

corruptly influenced, obstructed, and impeded, and endeavored to influence, obstruct, and impede, the due and proper administration of the law, under a pending proceeding before a department or agency of the United States, that is, the ongoing federal investigation by the Federal Bureau of Investigation, and the Internal Revenue Service, into Remington Financial Group, by emailing a document to potential witnesses in the investigation titled "Bluestone FAQ – Responses to Questions re RFG," containing false information about defendant MCMANUS' role in Remington Financial Group.

      In violation of Title 18, United States Code, Section 1505.

**COUNT THIRTY-THREE**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs One through Ten and Twelve through Forty-Seven of Count One of this indictment are incorporated here.

2.      On or about July 26, 2011, in Philadelphia, in the Eastern District of Pennsylvania, defendant

**MATTHEW MCMANUS**,

in a matter within the jurisdiction of the Federal Bureau of Investigation, and the Internal Revenue Service, agencies of the executive branch of the United States, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations in that defendant MATTHEW MCMANUS stated that he was only an independent contractor and never was an owner of Remington.

In violation of Title 18, United States Code, Section 1001.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT**:

1.      As a result of the violations of Title 18, United States Code, Sections 371, 1341, 1343, and 1957 set forth in this indictment, defendant

**ANDREW BOGDANOFF,**
**MATTHEW MCMANUS,**
**SHAYNE FOWLER,**
**JOEL NATHANSON, and**
**FRANK VOGEL**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offenses.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 982(a)(2).

**A TRUE BILL:**

_____

**GRAND JURY FOREPERSON**

_____

**ZANE DAVID MEMEGER**
**United States Attorney**