IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIM. NO. 12-190 |
| ANDREW BOGDANOFF, et al. | : | |

## ORDER

AND NOW, this _____ day of _____, 2013, having considered the government's Motion In Limine to Admit Evidence, it is hereby ORDERED that the motion is GRANTED, and the government may admit evidence that defendant Matthew McManus continued to commit an advance fee fraud scheme after he ended his involvement with Remington Financial Group and defendant Andrew Bogdanoff.

BY THE COURT:

_____
HONORABLE WILLIAM H. YOHN, JR.
*Senior Judge, United States District Court*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIM. NO. 12-190 |
| ANDREW BOGDANOFF, et al. | : | |

### GOVERNMENT'S MOTION IN LIMINE TO ADMIT EVIDENCE OF MATTHEW McMANUS' POST-REMINGTON ADVANCE FEE FRAUD SCHEME AS BOTH INTRINSIC EVIDENCE AND EVIDENCE UNDER FED. R. EVID. 404(b)

The United States, by its undersigned attorneys, hereby notifies the defendants of its intent to offer evidence under Fed. R. Evid. 404(b), and moves this Court in limine to permit introduction of Matthew McManus' continued perpetration of an advance fee fraud scheme after his involvement with Remington Financial Group ended, as both "intrinsic" evidence of the charged crimes in the indictment, and as Rule 404(b) evidence because it is relevant as evidence of McManus' "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," to engage in the fraud scheme charged in the indictment.

### I. INTRODUCTION

Defendant Matthew McManus is charged in the indictment with: (1) one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 371; (2) three counts of wire fraud, in violation of 18 U.S.C. § 1343; (3) three counts of money laundering, in violation of 18 U.S.C. § 1957; (4) one count of obstruction of justice, in violation of 18 U.S.C. § 1505; and (5) one count of making false statements to a federal agent, in violation of 18 U.S.C. § 1001. These charges stem from McManus' involvement in the Remington Financial Group

1

("Remington") advance fee fraud scheme described here, and his subsequent attempt to conceal this involvement from law enforcement.

### A. The Remington Financial Group Advance Fee Fraud.[1]

From at least 2005 to 2011, defendants Andrew Bogdanoff, Matthew McManus, Shayne Fowler, and Frank Vogel ran a complex advance fee fraud scheme, through a company called Remington Financial Group ("Remington"), inducing more than 1,900 victims to each pay more than $10,000 to secure commercial financing for their business project. The gist of the overarching fraud is that the these men and the other Remington employees engaged in the fraud did and said anything necessary to get customers to pay Remington's fees. At trial the government will show that the defendants used this scheme to steal more than $25 million.

In 1993 Bogdanoff started Remington in Philadelphia and incorporated the company in Pennsylvania, offering customers assistance in securing loans for commercial projects. Later, Bogdanoff hired Matthew McManus who became his partner and co-owner in the business. In approximately 1997, Bogdanoff moved to Arizona and incorporated the business there. From 1997 until 2008, Bogdanoff ran Remington's Arizona branch and McManus ran Remington's Philadelphia branch. Though Remington was one company until 2008, there were really two fairly distinct components: Remington of Arizona run by Bogdanoff, and Remington of Pennsylvania run by McManus. Most of the fraud originated out of the Arizona office, but as is explained below, the Pennsylvania office was responsible for helping perpetuate the fraud, and McManus reaped his share of the fraud profits.

---

[1] This is a summary of what the government expects to prove at trial. Numerous facts and details have been omitted.

2

1. **Remington's Letter of Interest**

The fraud was premised on employees in Remington's Arizona office selling Remington's Letter of Interest ("LOI") to customers looking for funding for their business venture. The LOI language has slightly changed over the years, but generally has an opening paragraph that read:

> [customer] has submitted a request for financing in the principal minimum amount of [XXXXX]. Based on our initial due-diligence and review of information provided to Remington, Remington is pleased to advise you or our acceptance of the application and **our lender's interest** to provide financing as more particularly described hereunder.

The LOI goes on to state the terms of the financing Remington's lender can provide. The LOI required the customer to pay a fee ranging from $5,000 up to $25,000 for Remington's services in securing this financing.

The LOI was entirely fraudulent. The LOI was written specifically to lead the customer to believe that Remington already had someone interested in financing their project and that financing was be forthcoming after the customer paid Remington's fee. This was not true. After the Remington sales person, called an account executive, had basic information about the project they would either decide themselves what loan terms to included in the LOI or they would ask defendants Bogdanoff or Fowler, who would supply the terms for the LOI. No one at Remington consulted with any lenders or investors, and the terms supplied in the LOI were completely unrealistic. They were meant solely to induce the customer to pay Remington's fee.

Remington was successfully able to deceive so many customers, in part, because it had arrangement with numerous "independent" brokers who referred their clients to Remington in exchange for a portion of the advance fee paid to Remington. Defendant Frank Vogel was the

most prolific of these brokers.

Vogel operated his own company named Arlington Richfield which he advertised, much like Remington, as a source for commercial funding. From 2006 to 2008, Vogel referred at least 47 customers to Remington. In dealing with these customers, Vogel and his two employees, who Vogel directed to use fake names, said that Remington and a related company, Northbridge,[2] was the funding source. Using this scheme, Vogel created fraud revenue of more than $1,000,000 for himself and Remington.

Defendant Shayne Fowler was Vogel's partner at Remington. Whereas most Remington LOI charged customers between $10,000 and $15,000. The LOI that Fowler and Vogel sent to Vogel's Arlington Richfield customers usually charged $25,000. These customers were not told that after they paid this fee, Remington kicked back approximately 40 percent of the fee to Vogel and sometimes set aside 10 percent of the fee for "liability." None of the customers Vogel referred to Remington ever received funding.

While most of Remington's fraudulent LOI were sold by Remington employees located in Arizona, the Philadelphia office also engaged in the same type of fraud. Indeed, McManus had a longstanding relationship with a New Jersey-based firm called Kilpatrick and Hart. Since at least 2005, Kilpatrick and Hart referred victims to Remington's Philadelphia office, who issued Remington's LOI to these victims. As with the deals originated through the

---

[2] At trial the government will show that Northbridge was a company owned in part by defendant Matthew McManus. In or about 2003, Northbridge made a $325,000 loan to a local real estate developer. The loan was funded directly by McManus and a number of other people. However, this loan went bad in 2004 and Northbridge did nothing after that. However, from 2005 to 2008 defendants Bogdanoff, McManus, Fowler, and Vogel told Remington victims that Northbridge was a lending source capable of funding projects of $2 million to $10 million.

4

Arizona office, these victims were led to believe that Remington was the "lender" or that Remington had someone ready to provide financing for their project. This was not true. However, to induce Kilpatrick and Hart to continue to send these clients to Remington, McManus had Remington pay Kilpatrick and Hart a portion of the LOI fee it received.

2. **Remington's Term Sheet**

Until late 2008, the defendants used this fraud scheme to induce customers to pay a second advance fee, in addition to the initial LOI fee. Shortly after the customer paid Remington's LOI fee, Remington's Philadelphia office run by defendant Matthew McManus would conduct due diligence on the customer's project. During this due diligence period, Remington would ask the customer to provide numerous documents and information about their specific project. Once the customer completed this first due diligence period, Remington's Philadelphia office would send the customer who already paid the LOI fee a document called a "Term Sheet."

The defendants used the Term Sheet, like the LOI, to induce customers to believe that upon payment of this fee, Remington's financing would be forthcoming. The opening provision of a typical Remington Term Sheet provided:

> Remington Financial Group, Inc. is pleased to acknowledge the application for commercial financing (the "Loan or Financing") from [customer name] or nominee, (the "Borrower"). Based on the completion of our preliminary due diligence and review of documentation submitted along with the signed Letter of Interest, we are pleased to set forth the following terms and conditions to be submitted for approval to Remington and its financing sources ("Lender or Investor") to providing financing to a single purpose entity as further defined herein. This Term Sheet is not to be construed as the final commitment. The following terms and conditions are subject to completion of due diligence of the project, verification of borrower's representations and final approval from Remington's lenders and/or investors.

5

As with the LOI, Bogdanoff wrote the Term Sheet very carefully to convey to the customer/victim that the issuance of a Term Sheet did not guarantee financing for the project. However, it left the customer with the unmistakable impression that Remington was able to provide the financing imminently once the payment was made. Every Term Sheet issued contained a clause indicating that the loan would close within a limited number of days. More importantly, the Term Sheet explicitly stated: "This Term Sheet is not a commitment to providing financing at this time. Remington shall ONLY become obligated to make the proposed loan upon its issuance of a Firm Commitment to Borrower . . . ."

Like the LOI, the Term Sheet was meaningless. It was simply a vehicle to steal more money from victims. At the time the Term Sheet was issued Remington had spoken to no lending sources, and Remington's employees knew that it would be difficult, if not impossible, to find financing for the project.

In June 2008, the Wall Street Journal published an article questioning whether Remington was a fraud. After the publication of this article, Bogdanoff realized that he had to eliminate the Term Sheet because it was much more difficult to defend. Thereafter Remington eliminated the Term Sheet and only sold the LOI, moving from a two-stage advance fee scheme to a one-stage advance fee scheme. After this shift Remington began charging higher LOI fees, but no longer received any Term Sheet revenue. As a result, Remington's fraud income fell from a high of approximately $9.7 million in 2008 to approximately $4 million in 2009.

### 3. The Other Lies Used to Sell the LOI and Term Sheet.

The defendants and the Remington employees who sold the LOI and Term Sheet used a variety of other lies and misrepresentations to further the fraud scheme. Remington used

6

its slick website to propagate the myth that Remington was a legitimate and successful company. On its website Remington provided vague details about projects that it "recently" secured funding for, such as: "Remington secures $5.8 Million construction to permanent financing for 103 unit apartment complex, Washington, DC." The primary problem with these representations is that Remington's Arizona pipeline (as this scheme was called by Remington insiders) had no success funding projects. At trial the government will show that from 2005 to 2011, over 1,900 victims paid Remington's Arizona office advance fees to secure financing. Remington secured funding for one project. Remington's "success" rate was less than one tenth of one percent.

Remington's account executives would also tell customers an assortment of lies to further induce the customer to pay the LOI and Term Sheet fee. These lies and misrepresentations included: (1) Remington was the lender or the investor; (2) Remington had a dedicated lending source, Northbridge; (3) Remington had five lending sources that were interested in the customer's project; (4) Remington's lender had pre-approved the customer's project; (5) Remington secured financing for 80% of its deals; and (6) if the customer did not pay Remington's fee, the investor was going to pull back the proposed funding. All of these lies were meant to make the customer believe that if they paid Remington's fees, funding was almost certain.

### 4. Protecting the Lie Through the Due Diligence Process.

The evidence will show that Remington induced more than 1,900 victims to pay the advance fees. Having victimized so many people the defendants needed a way to minimize the risk of criminal charges or civil lawsuits. The defendants used the due diligence process to do just this.

After a customer paid Remington's fee, Remington employees told customers that they needed to provide personal information and further information about their project so Remington could conduct due diligence. However, defendants Bogdanoff and McManus instructed the Remington employees to use the supposed due diligence inquiry to find problems with the projects so that Remington could find an excuse for why the project did not receive financing. This way Remington could blame its failure to fund the victim's loan on the victim himself or herself. To accomplish this goal Remington employees conducting supposed due diligence inquiries were instructed to: (1) ask customers to provide documents that Remington knew the customer could not produce; (2) ask customers to change the project in ways it knew were unacceptable to the customer; and (3) tell customers that the terms of financing in Remington's LOI needed to be dramatically changed in ways it knew were not economically feasible. Defendants Bogdanoff and McManus used the due diligence process to frustrate customers and cause them to eventually give up and walk away from the advance fees already paid to Remington.

### B. McManus' Advance Fee Fraud Scheme with Kilpatrick and Hart Continued Even After he Left Remington.

In the middle fo 2008, after the Wall Street Journal published an article suggesting that Remington, Bogdanoff, and McManus were perpetrating an advance fee fraud scheme, McManus split ways with Bogdanoff and terminated his ownership in Remington. From that point forward McManus ran Bluestone as a separate company. Bluestone, like Remington, continued selling LOI and collecting up-front fees.

Though McManus was now operating a separate company his relationship with

Kilpatrick and Hart did not end. Kilpatrick and Hart continued to refer customers to McManus and Bluestone, all the time telling these customers that Bluestone was the lender for their project. And Bluestone continued paying Kilpatrick and Hart a kickback for each customer that paid Bluestone's LOI fee.

## II. PROFFERED EVIDENCE

The government will call multiple witnesses to testify about Kilpatrick and Hart's agreement with McManus and its role in the Remington advance fee fraud scheme. One or more of these witnesses will also testify that McManus' business relationship continued after McManus separated from Bogdanoff. The government will also prove that McManus paid Kilpatrick and Hart kickbacks from 2005 through 2011. The government anticipates that the testimony relating to McManus' business relationship with Kilpatrick and Hart from 2008 to 2011 will be extremely focused and will take little additional time.

## III. LEGAL STANDARD FOR ADMISSIBILITY OF RULE 404(b) AND INTRINSIC EVIDENCE

As a general rule, all relevant evidence is admissible. See Fed. R. Evid. 402. Evidence is relevant if it has any tendency to make the existence of a fact of consequence more or less probable. See Fed. R. Evid. 401 (emphasis added). As stated above, the government seeks to introduce evidence related to Shelow's first indictment as both Rule 404(b) evidence as intrinsic evidence of the new set of fraud charges.

The admissibility of evidence of other crimes is addressed by Federal Rule of Evidence 404(b). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity

9

> therewith. It may, however, be admissible for other purposes, such
> as proof of motive, opportunity, intent, preparation, plan, knowledge,
> identity or absence of mistake or accident, provided that upon request
> by the accused, the prosecution in a criminal case shall provide
> reasonable notice in advance of trial, or during trial if the court
> excuses pretrial notice on good cause shown, of the general nature of
> any such evidence it intends to introduce at trial.

The drafters of rule 404(b) "intended to emphasize the admissibility of other crimes evidence." United States v. Long, 547 F.2d 761, 766 (3d Cir. 1978). This emphasis is consistent with the long history of the Third Circuit of favoring admission of such evidence, "if relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime." Id.; see also United States v. Givan, 320 F.3d 452, 460 (3d Cir. 2003); United States v. Simmons, 679 F.2d 1042, 1050 (3d Cir. 1982).

The Supreme Court has held that evidence is admissible under Fed. R. Evid. 404(b) when the following requirements are satisfied: (1) a proper evidentiary purpose; (2) relevance under Fed. R. Evid. 402; (3) a weighing of the probative value of the evidence against its prejudicial effect under Fed. R. Evid. 403; and (4) a limiting instruction concerning the purpose for which the evidence may be used. See United States v. Mastrangelo, 172 F.3d 288, 294-95 (3d Cir. 1999) (citing Huddleston v. United States, 485 U.S. 681, 691-92 (1988)).

Ultimately, Rule 404(b) is a rule of inclusion, not exclusion. United States v. Console, 13 F.3d 641, 659 (ed Cir. 1993); United States v. Sampson, 980 F.2d 833 (3d Cir. 1992); Government of Virgin Islands v. Edwards, 903 F.2d 267, 270 (3d Cir. 1990). "Thus, the burden on the government is not onerous. All that is needed is some showing of a proper relevance. Whereupon the trial court must judge the government's proffered reason, the potential for confusion and abuse, and the significance of the evidence, and decide whether its probative

value outweighs its prejudicial effect." Sampson, 980 F.2d at 888. "The parameters of Rule 404(b) are not set by the defense's theory of the case; they are set by the material issues and facts the government must prove to obtain a conviction." Id.

Where the government offers bad act evidence, "it must clearly articulate how that evidence fits into a chain of logical inference, no link of which can be the inference that because the defendant committed ... offenses before, he therefore is more likely to have committed this one." Sampson, 980 F.2d at 886. Once the government has done so, the district court must weigh the probative value of the evidence against its potential to cause undue prejudice and articulate a rational explanation on the record for its decision to admit or exclude the evidence. See United States v. Himelwright, 42 F.3d 777, 780 (3d Cir. 1994); United States v. Jemal, 26 F.3d 1267, 1272 (3d Cir. 1994); Sampson, 980 F.2d at 889; see also Huddleston, 485 U.S. at 691. Evidence is unfairly prejudicial if it suggests a decision on an improper basis. See Fed. R. Evid. 403, Advisory Committee Note. "Rule 403 makes explicit that the law shields a defendant against unfair prejudice, not against all prejudice." United States v. Smith, 292 F.3d 90, 99 (1st Cit. 2002) (citing United States v. Candelaria-Silva, 162 F.3d 698, 705 (1st Cir. 1988) (internal quote marks omitted) and United States v. Rodriguez-Estrada, 877 F.2d 153, 156 (1st Cir. 1989) ("[A]ll evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided.")). See United States v. Johnson, 199 F.3d 123, 128 (3d Cir. 1999) ("In weighing the probative value of evidence against the dangers ... in Rule 403, the general rule is that the balance should be struck in favor of admission") (quoting United States v. Dennis, 625 F.2d 787, 797 (8th Cir. 1980)).

Any danger of prejudice associated with 404(b) evidence can be ameliorated

11

through a proper limiting instruction. As the Third Circuit enunciated, a limiting instruction will eliminate any potential for unfair prejudice and ensure that the jury does not consider the evidence for an improper purpose. United States v. Sriyuth, 98 F.3d 739, 748 (3d Cir. 1996); Sampson, 980 F.2d at 886. As the Third Circuit has observed,

> We note . . . that it is a basic tenet of our jurisprudence that a jury is presumed to have followed the instructions the court gave it, see Givan, 320 F.3d at 462 (citing United States v. Gilsenan, 949 F.2d 90, 96 (3d Cir. 1991)) and the court's [limiting] instructions did not allow the use of evidence [to establish the defendant's criminal propensity]. If we preclude the use of evidence admissible under Rule 404(b) because of a concern that jurors will not be able to follow the court's instructions regarding its use we will inevitably severely limit the scope of evidence permitted by that important rule.

Givan, 320 F.3d at 461.

As long as the district court adequately explains its reasons for admitting or excluding evidence pursuant to Rule 403, the decision is entirely within the court's discretion and the Court of Appeals reviews the decision only for an abuse of discretion. Id.; Government of Virgin Islands v. Blake, 118 F.3d 972, 977 (3d Cir. 1997). Indeed, the Third Circuit has stated that "if judicial restraint is ever desirable it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." United States v. Balter, 91 F.3d 427, 442 (3d Cir. 1996); see also United States v. Retos, 25 F.3d 1220, 1228 (3d Cir. 1994) ("[i]t is the trial court, of course, and not the Court of Appeals, which is in the best position to consider the complicated evidentiary issues involved in a given case, and to strike the balance required by Rule 403").

Not all evidence of acts is subject to Rule 404(b). Rule 404(b) applies to evidence of wrongful acts which are "extrinsic" to the charged offense. Evidence which is "intrinsic" does

not fall within the rule. United States v. Green, 617 F.3d 233, 245 (3d Cir. 2010). In Green, the court explained that the "intrinsic" label is reserved "for two narrow categories of evidence." Id. at 248. "First, evidence is intrinsic if it 'directly proves' the charged offense." Id. (citations omitted). "Second, 'uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime.'" Id. at 249 (quoting United States v. Bowie, 232 F.3d 923, 929 (D.C. Cir. 2000)).

## IV. THE PROPOSED EVIDENCE IS CLEARLY ADMISSIBLE AS INTRINSIC EVIDENCE AND UNDER RULE 404(b)

At trial the government seeks to admit evidence relating to McManus' relationship with Kilpatrick and Hart after McManus separated from Remington in 2008 as both intrinsic evidence and as Rule 404(b) evidence. This evidence is admissible under both legal standards.

This evidence should be admitted as intrinsic to the charged offenses because it directly "proves the charged offense," under Green. The government seeks to admit evidence that McManus continued to engage in an advance fee fraud scheme with Kilpatrick and Hart, even after he separated from Remington because it clear evidence of his intent to commit the fraud charged in the indictment and his knowing involvement in that scheme.

The indictment charges McManus with knowingly engaging in a massive scheme to defraud numerous victims by fraudulently inducing them to pay Remington large advance fees hoping that Remington would provide funding for their commercial project. Specifically, the government alleges that (1) McManus ran the Philadelphia office where Remington employees sent out fraudulent term sheets; (2) McManus along with Bogdanoff shared in the proceeds from

the fraud; and (3) McManus created a company called Northbridge that he, Bogdanoff, and Remington's employees then used as a fictional source of funding to induce victims to pay Remington's fees. Accordingly, evidence that McManus engaged in the exact same fraud scheme by himself during, and after he separated from Remington in 2008 will be used to show that: (1) McManus had motive to engage in the scheme; and (2) McManus's involvement in the scheme was intentional and not the product of any mistake.

If the Court concludes that this evidence is not "intrinsic," then it certainly should be admitted under Green as 404(b) evidence. In Green the Third Circuit stated that "allowing the jury to understand the circumstances surrounding the charged crime - completing the story - is a proper, non-propensity purpose under Rule 404(b)." Green, 617 F.3d at 247. It is certain that this evidence meets the Huddleston criteria. The government has already established relevance and a proper evidentiary purpose. The similarities between the two fraud schemes show his knowledge and intent to commit the charged scheme as well as a common plan. See United States v. Bergrin, 682 F.3d 261, 281 (3d Cir. 2012) (holding that a defendant's involvement in a similar crime, occurring after the charged crime, was admissible under Rule 404(b) to show intent to commit the charged act); United States v. Jermal, 26 F.3d 1267, 1276 (3d Cir. 1994) (admitting under Rule 404(b), in a mail fraud prosecution, evidence of prior bad acts to prove intent); Johnson, 199 F.3d at 128 (prior robbery was admissible for purpose of showing a common plan under Rule 404(b)); see also United States v. Byrd, 208 Fed. Appx. 145, 149 (3d Cir. 2006) (not precedential) (evidence from prior uncharged scheme was admissible to show common plan in bank fraud prosecution).

Under a Rule 403 balancing test the probative value of this evidence greatly

exceeds the danger of any undue prejudice. The government will introduce evidence about McManus' continued business relationship with Kilpatrick and Hart not to establish that McManus has a propensity to commit crimes, but to show that he was not an unknowing participant in the Remington fraud scheme. This evidence creates no danger of undue prejudice. Finally, any danger of undue prejudice, no matter how slight, can be ameliorated through limiting instruction based on Third Circuit Model Jury Instruction § 4.29. See Givan, 320 F.3d at 462; Sriyuth, 98 F.3d at 748.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that the government's motion in limine be granted and the Court admit evidence of McManus' advance fee fraud scheme with Kilpatrick and Hart after he ended his involvement with Remington, as both intrinsic evidence of the crime charged and as Rule 404(b).

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

DAVID L. AXELROD
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing motion and memorandum has been served by me, this date, by mail and via the Court's electronic filing system:

Lisa A. Mathewson, Esq.
The Offices of Lisa A. Mathewson LLC
123 South Broad Street, Suite 810
Philadelphia, PA 19109

DAVID L. AXELROD
Assistant United States Attorney

DATED: 1/8/13