# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        :

       **v.**                         :        CRIMINAL NO.   12-190

MATTHEW McMANUS            :

## <u>GOVERNMENT'S TRIAL MEMORANDUM</u>

       The United States of America, by its attorneys, Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, and David L. Axelrod, Assistant United States Attorney, respectfully submit this trial memorandum to assist the Court during the trial scheduled to begin on January 21, 2014.

# I.     THE INDICTMENT

The thirty-three count indictment filed in this case charges Andrew Bogdanoff, Matthew McManus, Shayne Fowler, Joel Nathanson, Frank Vogel, and Aaron Bogdanoff with various crimes related to the operation of a massive advance fee fraud scheme.   Andrew Bogdanoff, Fowler, Nathanson, and Aaron Bogdanoff have pled guilty.   Frank Vogel's case was transferred to the Eastern District of Michigan pursuant to Rule 20 of the Federal Rules of Criminal Procedure.   The following chart reflects the counts charging McManus with violations of federal law:

| Count | Charge |
| --- | --- |
| One | Conspiracy to commit mail and wire fraud (18 U.S.C. § 371) |
| Three | Wire fraud (18 U.S.C. § 1343) |
| Four | Wire fraud (18 U.S.C. § 1343) |
| Six | Wire fraud (18 U.S.C. § 1343) |
| Seventeen | Money Laundering (18 U.S.C. § 1957) |
| Eighteen | Money Laundering (18 U.S.C. § 1957) |
| Nineteen | Money Laundering (18 U.S.C. § 1957) |
| Thirty-Two | Obstruction of justice (18 U.S.C. § 1505) |
| Thirty-Three | False statements to a federal officer (18 U.S.C. § 1001) |

## II.   STATUTES CHARGED

### A.   Conspiracy to Commit Mail and Wire Fraud

Title 18, United States Code, Section 371 provides, in pertinent part, that:

> If two or more persons conspire commit any offense against the United States . . . in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

### B.   Mail Fraud

Title 18, United States Code, Section 1341 provides, in pertinent part, that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do . . . knowingly causes to be delivered by mail or such carrier according to the direction thereon . . . shall be fined under this title or imprisoned not more than 20 years, or both.

### C.   Wire Fraud

Title 18, United States Code, Section 1343 provides that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

### D.   Money Laundering

Title 18, United States Code, Section 1957 provides, in relevant part, that:

> Whoever, in any of the circumstances set forth in subsection (d), knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

E.      **Obstruction of Justice**

Title 18, United States Code, Section 1505 provides, in relevant part, that:

> Whoever corruptly influences, obstructs, or impedes or endeavors to influence, obstruct or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States . . . [s]hall be fined under this title [and] imprisoned not more than 5 years . . .

F.      **False Statements**

Title 18, United States Code, Section 1001 provides, in relevant part, that:

> [W]hoever, in any matter within the jurisdiction of the executive . . . branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement, or representation . . . shall be fined under this title, imprisoned not more than 5 year . . . .

## III.   ELEMENTS OF THE CRIMES CHARGES

A.      **Conspiracy to Commit Mail and Wire Fraud (Count One)**

To prove a violation of Title 18, United States Code, Section 371 (conspiracy to commit mail and wire fraud), the government must prove beyond a reasonable doubt:

1.      That two or more persons agreed "to commit an offense against the United States," as charged in the information;

2.      That the defendant was a party to or a member of that agreement;

3.      That the defendant joined the agreement or conspiracy knowing of its objective to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit an offense against the United States; and

4.      That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objective of the agreement.

Third Cir. Model Jury Instruction (Criminal) 6.18.371B.

**B.     Wire Fraud (Counts Three, Four, and Six)**

To prove a violation of Title 18, United States Code, Section 1343 (wire fraud), the

government must prove beyond a reasonable doubt:

1.     That the defendant devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises, or willfully participated in such a scheme with knowledge of its fraudulent nature;

2.     That the defendant acted with the intent to defraud; and

3.     That in advancing, furthering, or carrying out the scheme, the defendant transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce.

Third Cir. Model Jury Instruction (Criminal) 6.18.1343.

**C.     Money Laundering (Counts Seventeen through Nineteen)**

To prove a violation of Title 18, United States Code, Section 1957 (money

laundering), the government must prove beyond a reasonable doubt:

1.     That the defendant engaged (or attempted to engage) in a monetary transaction affecting interstate commerce;

2.     That the monetary transaction involved criminally derived property of a value greater than $10,000;

3.     That the property was derived from specified unlawful activity;

4.     That the defendant acted knowingly, that is, with knowledge that the transaction involved proceeds of a criminal offense; and

5.     That the transaction took place in the United States.

Modern Federal Jury Instructions - Criminal, P 50A.06, Instruction 50A-26.

D.    **Obstruction of Justice (Count Thirty-Two)**

To establish a violation of 18 U.S.C. § 1505 the government must prove the

following elements beyond a reasonable doubt:

      1.    That on or about the date set forth in the indictment, a proceeding was pending before an agency of the United States;

      2.    That the defendant knew that a proceeding was pending before an agency of the United States; and

      3.    That the defendant corruptly endeavored to influence, obstruct or impede the due and proper administration of the law under which the proceeding was being conducted.

Modern Federal Jury Instructions - Criminal, P 46.02, Instruction 46-9 (2011).

E.    **False Statement to a Federal Agent (Count Thirty-Three)**

To establish a violation of 18 U.S.C. § 1001 the government must prove the

following elements beyond a reasonable doubt:

      1.    That the defendant made a false statement to the Federal Bureau of Investigation regarding a matter within its jurisdiction;

      2.    That the defendant made the statement intentionally, knowing that it was false;

      3.    That the statement was material; and

      4.    That the defendant made the false statement for the purpose of misleading the Federal Bureau of Investigation.

A statement is material if it has a natural tendency to influence, or is capable of

influencing, a decision of the Federal Bureau of Investigation.   It is not necessary to show that the

Federal Bureau of Investigation was in fact misled.

Fifth Circuit Criminal Pattern Instruction § 2.49

## IV.   THE FACTS[1]

From at least 2005 to 2011, defendants Andrew Bogdanoff, Matthew McManus, Shayne Fowler, Joel Nathanson, and Frank Vogel participated in a complex advance fee fraud scheme, through a company called Remington Financial Group ("Remington"), inducing more than 1,900 victims to each pay more than $10,000 to secure commercial financing for their business project.   The gist of the overarching fraud is that the these men and other Remington employees engaged in the fraud did and said anything necessary to get customers to pay Remington's fees.   At trial the government will show that the defendants used this scheme to steal more than $25 million.

### A.   The Remington Financial Group Advance Fee Fraud.

In 1993 Bogdanoff started Remington in Philadelphia and incorporated the company in Pennsylvania, offering customers' assistance in securing loans for commercial projects.   Later, Bogdanoff hired Matthew McManus who became his partner and co-owner in the business.   In approximately 1997, Bogdanoff moved to Arizona and incorporated the business there.   From 1997 until 2008, Bogdanoff ran Remington's Arizona branch and McManus ran Remington's Philadelphia branch.   Though Remington was one company until 2008, there were two somewhat distinct components: Remington's Arizona office run by Bogdanoff, and Remington's Philadelphia office run by McManus.   Most of the fraud originated out of the Arizona office, but as will be demonstrated at trial, the Philadelphia office ran by McManus engaged in the same deceptive tactics, the Philadelphia office was responsible for helping

---

[1]This portion of the trial memorandum is meant only to summarize some of the facts the government may introduce at trial.   Numerous facts and details have been omitted.

perpetuate the Arizona fraud, McManus was the architect of one of the biggest lies Remington

used to commit this massive fraud, and McManus reaped his share of the fraud profits.

## 1.     Remington's Letter of Interest

The fraud was premised on employees in Remington's Arizona office selling

Remington's Letter of Interest ("LOI") to customers looking for funding for their business venture.

The LOI language has slightly changed over the years, but generally has an opening paragraph that

read:

> [customer] has submitted a request for financing in the principal minimum amount of
> [XXXXX].   Based on our initial due-diligence and review of information provided to
> Remington, Remington is pleased to advise you or our acceptance of the application and
> **our lender's interest** to provide financing as more particularly described hereunder.

The LOI goes on to state the terms of the financing Remington's lender can provide.   The LOI

required the customer to pay a fee ranging from $5,000 up to $25,000 for Remington's services in

securing this financing.[2]

---

[2]Many states, including Pennsylvania, carefully regulate businesses that accept advance
fees for loan brokering services, often requiring such businesses to register with the state or
maintain a bond with the state.   Pennsylvania requires any company acting as a loan broker to
register with the Pennsylvania Department of Banking, and prohibits any loan broker from
collecting an advance fee.   See Credit Services Act of Dec. 16, 1992, P.L. 1144, No. 150, Section
8.   See also Illinois Loan Brokers Act of 1995, 815 Ill. Comp. Stat. 175/15-1 *et seq.* (2002).
Remington was not registered with the Pennsylvania Department of Banking.   In 2008, the
Illinois Secretary of State initiated an investigation of Remington, accusing Remington in a letter
of operating as an unlicensed loan broker.   Defendant Andrew Bogdanoff responded to this letter
in October 2008 in a letter filled with misrepresentations and lies.   Remington received a similar
letter from the North Dakota Department of Financial Institutions in 2006.   Indeed, there is no
evidence that Remington took any steps to operate as a legitimate company in Illinois, North
Dakota, or Arizona.   Under Arizona law, a person who takes an "advance fee" for work procuring
a loan or extension of credit must register as an "advance fee loan broker."   Ariz. Rev. Stat. §
6-1301 *et seq.*   Remington was not registered in Pennsylvania or any other state as required by
state law.

8

The LOI was entirely fraudulent.   The LOI was written specifically to lead the customer to believe that Remington already had someone interested in financing their project and that financing was be forthcoming after the customer paid Remington's fee.   This was not true. After the Remington sales person, called an account executive, had basic information about the project they would either decide themselves what loan terms to include in the LOI or they would ask defendants Bogdanoff or Fowler, who would supply the terms for the LOI.   No one at Remington consulted with any lenders or investors, and the terms supplied in the LOI were completely unrealistic.   They were meant solely to induce the customer to pay Remington's fee.

### 2.    Remington's Term Sheet

Until late 2008, the defendants used this fraud scheme to induce customers to pay a second advance fee, in addition to the initial LOI fee.   Shortly after the customer paid Remington's LOI fee, Remington's Philadelphia office run by defendant Matthew McManus would conduct due diligence on the customer's project.   During this due diligence period, Remington would ask the customer to provide numerous documents and information about their specific project.   Once the customer completed this first due diligence period, Remington's Philadelphia office would send the customer who already paid the LOI fee a document called a "Term Sheet."

The defendants used the Term Sheet, like the LOI, to induce customers to believe that upon payment of this fee, Remington's financing would be forthcoming.   The opening provision of a typical Remington Term Sheet provided:

> Remington Financial Group, Inc. is pleased to acknowledge the application for commercial financing (the "Loan or Financing") from [customer name] or nominee, (the "Borrower"). Based on the completion of our preliminary due diligence and review of documentation submitted along with the signed Letter of Interest, we are pleased to set forth the following terms and conditions to be submitted for approval to Remington and its financing sources

("Lender or Investor") to providing financing to a single purpose entity as further defined herein.  This Term Sheet is not to be construed as the final commitment.  The following terms and conditions are subject to completion of due diligence of the project, verification of borrower's representations and final approval from Remington's lenders and/or investors.

As with the LOI, Remington wrote the Term Sheet very carefully to convey to the customer/victim that the issuance of a Term Sheet did not guarantee financing for the project.  However, it left the customer with the unmistakable impression that Remington was able to provide the financing imminently once the payment was made.  Every Term Sheet issued contained a clause indicating that the loan would close within a limited number of days.  More importantly, the Term Sheet explicitly stated: "This Term Sheet is not a commitment to providing financing at this time.  Remington shall ONLY become obligated to make the proposed loan upon its issuance of a Firm Commitment to Borrower . . . ."

Like the LOI, the Term Sheet was meaningless.  It was simply a vehicle to steal more money from victims.  At the time the Term Sheet was issued Remington had spoken to no lending sources, and Remington's employees knew that it would be difficult, if not impossible, to find financing for the project.

In June 2008, the Wall Street Journal published an article questioning whether Remington was a fraud.  After the publication of this article McManus attempted to distance himself from Remington in various ways.  He lied to Remington's accountants by telling them that he had relinquished his ownership in Remington at the beginning of 2007 and he deleted his Remington email account.

After the publication of this article, Bogdanoff realized that he had to eliminate the Term Sheet because it was much more difficult to defend.  Thereafter Remington eliminated the Term Sheet and only sold the LOI, moving from a two-stage advance fee scheme to a one-stage

10

advance fee scheme.   After this shift Remington began charging higher LOI fees, but no longer received any Term Sheet revenue.   As a result, Remington's fraud income fell from a high of approximately $9.7 million in 2008 to approximately $4 million in 2009.

### 3.    The Other Lies Used to Sell the LOI and Term Sheet.

The defendants and the Remington employees who sold the LOI and Term Sheet used a variety of other lies and misrepresentations to further the fraud scheme.   Remington used various incarnations of its website to propagate the myth that Remington was a legitimate and successful company.   On its website Remington provided vague details about projects that it "recently" secured funding for, such as: "Remington secures $5.8 Million construction to permanent financing for 103 unit apartment complex, Washington, DC."   The primary problem with these representations is that Remington's Arizona pipeline (as this scheme was called by Remington insiders) had no success funding projects.   At trial the government will show that from 2005 to 2011, over 1,900 victims paid Remington's Arizona office advance fees to secure financing.   Remington secured funding for one project.   Remington's "success" rate was less than one tenth of one percent.

Remington's account executives would also tell customers an assortment of lies to further induce the customer to pay the LOI and Term Sheet fee.   These lies and misrepresentations included: (1) Remington was the lender or the investor; (2) Remington had a dedicated lending source, Northbridge; (3) Remington had five lending sources that were interested in the customer's project; (4) Remington's lender had pre-approved the customer's project; (5) Remington secured financing for 80% of its deals; and (6) if the customer did not pay Remington's fee, the investor was going to pull back the proposed funding.   All of these lies were meant to make the customer believe that if they paid Remington's fees, funding was almost certain.

11

### 4.    Remington's Use of "Independent" Brokers to Promote the Scheme

Remington was successfully able to deceive so many customers, in part, because it had arrangement with numerous "independent" brokers who referred their clients to Remington in exchange for a portion of the advance fee paid to Remington.   Defendant Frank Vogel was the most prolific of these brokers.

Vogel operated his own company named Arlington Richfield which he advertised, much like Remington, as a source for commercial funding.   From 2006 to 2008, Vogel referred at least 47 customers to Remington.   In dealing with these customers, Vogel and his two employees, who Vogel directed to use fake names, said that Remington and a related company, Northbridge, was the funding source.   Using this scheme, Vogel created fraud revenue of more than $1,000,000 for himself and Remington.

Defendant Shayne Fowler was Vogel's partner at Remington.   Whereas most Remington LOI charged customers between $10,000 and $15,000.   The LOI that Fowler and Vogel sent to Vogel's Arlington Richfield customers usually charged $25,000.   These customers were not told that after they paid this fee, Remington kicked back approximately 40 percent of the fee to Vogel and sometimes set aside 10 percent of the fee for "liability," because so many of the customers Vogel successfully induced to pay Remington's advance fees either ended up demanding a refund or filing a lawsuit.   None of the customers Vogel referred to Remington ever received funding.

### 5.    Defendant McManus' Role in the Remington Scheme

While most of Remington's fraudulent LOI were sold by Remington employees located in Arizona, the Philadelphia office also engaged in the same type of fraud.   Indeed, McManus had a longstanding relationship with a New Jersey-based firm called Kilpatrick and

Hart.   Since at least 2005, Kilpatrick and Hart referred victims to Remington's Philadelphia office, who issued Remington's LOI to these victims.   As with the deals originated through the Arizona office, these victims were led to believe that Remington was the "lender" or that Remington had someone ready to provide financing for their project.   This was not true.   However, to induce Kilpatrick and Hart to continue to send these clients to Remington, McManus had Remington pay Kilpatrick and Hart a portion of the LOI fee it received.   As with the "Arizona pipeline," Remington did not expect to find financing for the Kilpatrick and Hart deals originated by the Philadelphia office.   Rather, these deals were originated solely to collect advance fees.

McManus was also the architect of the Northbridge lie.   At trial the government will show that Northbridge was a company owned in part by defendant Matthew McManus.   In or about 2004, Northbridge made a $325,000 loan to a local real estate developer.   The loan was funded directly by McManus and a number of other people.   However, this loan went bad in 2005 with Northbridge filing a lawsuit to attempt to recover its investment.   Besides this initial project Northbridge had no other funds and made no other loans.

Despite these facts, McManus used Northbridge as a tool to induce victims to pay Remington advance fees.   McManus directed his employees to tell potential customers that Northbridge was a $350 million fund.   McManus publicized it on Remington's website as a fund able to finance projects needing $2 million to $15 million.   McManus issued false press releases stating that Remington had used Northbridge to fund deals that Northbridge had nothing to do with.   And McManus issued a commitment letter to a Remington victim stating that Northbridge was ready to deliver $46 million in funding if the victim paid Remington an up-front fee of $469,000.

13

**B.    Protecting the Lie Through the Due Diligence Process.**

The evidence will show that Remington induced more than 1,900 victims to pay the advance fees.   Having victimized so many people the defendants needed a way to minimize the risk of criminal charges or civil lawsuits.   The defendants used the due diligence process to do just this.

After a customer paid Remington's fee, Remington employees told customers that they needed to provide personal information and further information about their project so Remington could conduct due diligence.   However, defendants Bogdanoff and McManus instructed the Remington employees to use the supposed due diligence inquiry to find problems with the projects so that Remington could find an excuse for why the project did not receive financing.   This way Remington could blame its failure to fund the victim's loan on the victim himself or herself.   To accomplish this goal Remington employees conducting supposed due diligence inquiries were instructed to: (1) ask customers to provide documents that Remington knew the customer could not produce; (2) ask customers to change the project in ways it knew were unacceptable to the customer; and (3) tell customers that the terms of financing in Remington's LOI needed to be dramatically changed in ways it knew were not economically feasible.   Defendants Bogdanoff and McManus used the due diligence process to frustrate customers and cause them to eventually give up and walk away from the advance fees already paid to Remington.

**C.    McManus' Money Laundering**

From in or about 2005 to in or about 2009, Remington victims whose projects were originated by the Arizona office were directed to pay the LOI fee by wire or check, usually wire, to Remington's main Arizona bank account at Home National Bank (account ending in 9201).

14

From in or about March to November 2007, Remington victims who paid the term sheet fee were directed to send this payment, by check or wire, to Remington's main Philadelphia bank account at Republic First Bank (account ending in 9205).   As charged in the indictment, McManus engaged in the following three monetary transactions using funds from these two accounts:

1.    On or about June 5, 2007, McManus deposited a check for $50,000, written by Bogdanoff, in to his Citizen's Bank checking account (ending in 5596), drawn on Remington's Republic First account (ending in 9205).

2.    On or about August 16, 2007, McManus deposited a check for $40,000, written by Bogdanoff, in to his Citizen's Bank checking account (ending in 5596), drawn on Remington's Republic First account (ending in 9205).

3.    On or about January 21, 2008, McManus deposited three checks totaling $36,619.89, written by Bogdanoff, in to his Citizen's Bank checking account (ending in 5596), drawn on Remington's Home National Bank account (ending in 9201).

**D.    The Investigation by the FBI and IRS**

On March 15, 2011, agents from the FBI and IRS executed search warrants at Remington's offices located in Arizona and Colorado.   During the execution of these warrants, law enforcement seized substantial amount of business records and computers.   A number of the computers were then searched and analyzed by FBI computer forensic examiners.   Both hard copy records seized from Remington's offices and electronic records discovered on Remington's computers will be used at trial.

Word of law enforcement's investigation at Remington's offices spread quickly. At Bluestone Real Estate Capital ("Bluestone"),[3] employees including defendant Matthew McManus heard about the searches almost immediately.   Only three days later on March 18, 2011, McManus sent an unsolicited email to three Bluestone employees titled "Confidential." This email contained an attachment titled "Bluestone FAQ - Responses to Questions re RFG.doc." The attached document contained the following misrepresentations about McManus' role in Remington:

> **Are Bluestone and Remington Financial Group the same company?**   No.   Bluestone Real Estate Capital and Remington Financial Group/Remington Capital are two completely separate companies and never were the same.
>
> **What is the Relationship between the companies?**
>
> There is no relationship between the two firms.   The confusion in the market place stems from the existence of Remington Financial Group, Inc., a Pennsylvania company and Remington Financial Group of Arizona.   When RFG of Arizona began to grow, so did the confusion.   Therefore, the principal and executives of Remington of PA left Remington of PA and formed Bluestone Real Estate Capital to denote its distinction from RFG Arizona and from the RFG name altogether.   Bluestone's focus is on the institutional caliber client. As far as Bluestone knows, Remington of PA ceased its existence when Bluestone was formed.
>
> \*\*\*
>
> **How is Matthew McManus affiliated to RFG?**   Matthew McManus is a former Remington of PA independent contractor.   McManus left Remington in 2006 with other Remington of PA producers to launch Bluestone Real Estate Capital, a real estate

---

[3]Bluestone was "launched" by Remington on March 1, 2007, and despite having a separate name, worked with Remington as essentially one company until late 2008.   During this time, Remington and Bluestone shared expenses, office space, and personnel, and Bogdanoff and McManus shared in the profits generated by the two companies.   Sometime around the beginning of 2009, Bluestone and Remington ceased to be affiliated and stopped sharing expenses and revenue.   But, as discussed in the government's Motion to Admit Evidence of Matthew McManus' Post-Remington Advance Fee Fraud Scheme, McManus and his company continued to use fraudulent tactics to induce the payment of advance fees even after he separated from Remington.

investment banking firm that focuses on securing financing for the nation's top-tier real estate companies.[4]

McManus' email demonstrates that he knew law enforcement was investigating Remington and would likely interview people about McManus' role in Remington and the relationship between Bluestone and Remington.   Clearly, McManus hoped that these misrepresentations would be repeated to law enforcement and McManus could distance himself from the Remington fraud he benefitted from so much.

This email was McManus' first attempt to mislead law enforcement.   Only days later, on March 22, 2011, two FBI agents visited McManus at his Philadelphia office.   McManus voluntarily agreed to speak to the agents and during this interview said that he was an independent contractor for Remington and was never a "W-2" employee.   However, this was a lie.   McManus was an owner and a Remington W-2 employee.   This was not the only lie McManus told the agents.   McManus also used the following lies: (1) Bluestone was never a part of, or affiliated with, Remington; (2) after Bluestone was formed, Remington of Pennsylvania ceased to operate; and (3) any payments that were made between Remington and Bluestone were referral fees.

---

[4] On or about July 26, 2011, the government served a grand jury subpoena on defendant as owner of Bluestone seeking production of various types of documents, including: (1) "All documents pertaining to the relationship between Bluestone and Remington, including, but not limited to, corporate records, agreements, transactions, communications to third parties"; and (2) "Books, records, receipts, notes, ledgers, photographs, communications, and any other documents related to the activities of Bluestone, Remington, and any subsidiaries or affiliates."   Bluestone failed to produce this email.

On July 26, 2011, the same FBI agents visited McManus at his Philadelphia office to ask him additional questions.    During this second interview, McManus lied again, and told the agents that he was a Remington "independent contractor" and never owned any part of Remington. This lie is flatly contradicted by tax documents filed with the IRS by Remington and McManus, and other documents.

**E.    McManus Continued to Lie About his Involvement in Remington.**

Later in 2011, McManus was negotiating to sell Bluestone and work for another firm.    As part of this negotiation process he executed an employment application where he falsely stated that he has worked for "self/Bluestone" since 1993.    McManus purposefully omitted any reference to Remington on this application.    However, the firm learned about McManus' connection to Remington and inquired about his status as an officer of Remington, his ownership of Remington, and the existence of fee sharing agreements with Remington.    On September 19, 2011 McManus had his attorney, Mark Haltzman, send an email to the firm fraudulently stating that "I spoke with Matthew McManus . . . and he indicated to me that at no time . . . was [McManus] ever [a] shareholder/officer/director of Remington."[5]    Subsequently, during an in-person meeting in Philadelphia, McManus repeated these lies.

_____

[5] Bluestone also failed to produce these emails pursuant to the grand jury subpoena.

V.     **WITNESSES**

  The Government may call the following witnesses in its case-in-chief:

A. **Law Enforcement/Government Regulators:**

  1. Federal Bureau of Investigation Special Agent Leah Chambers

  2. Federal Bureau of Investigation Special Agent Annette Murphy

  3. Internal Revenue Service Special Agent Richard Martin

  4. Federal Bureau of Investigation Computer Examiner D. Justin Price

B. **Former Remington Employees:**

  1. Daniel Gura

  2. Tyler Hufford

  3. Joel Nathanson

  4. Shayne Fowler

  5. Bradley Sweet

  6. Greg Weimer

  7. Nancy Stevens

  8. Matthew Benioff

  9. Thomas Neece

  10. Matthew Wasko

  11. Dean Elfman

  12. Kristopher Wood

  13. Deborah Duva

  14. Suzanne Moses

  15. Nicole Heyninck

  16. Aaron Enright

**C.    Miscellaneous**

      1.     Steven Shotz

      2.     Hank Abrams

      3.     Amy Stumhoffer

      4.     Keiran McManus

      5.     Paul Mudrich

      6.     Mark Haltzman

      7.     Tom Hart

**D.    Remington Victims**

The government has identified over 1,900 Remington victims.    At trial the government will call a number of these witnesses to testify, including:[6]



_____

[6]These names have been redacted here.    However, the government has provided defendant a list of victims it expects to call as witnesses.





### E.    Custodial Witnesses

The government has prepared a business records stipulation that, if agreed to, will eliminate the need to call numerous custodial witnesses. However, should the defendant not agree to stipulate to the admission of certain specified business records, the government will need to call these custodial witnesses.

The government reserves the right to request the Court's permission to supplement its witness list as may be required. The government may also call rebuttal witnesses not listed here in the event the defendant elects to present any defense.

## VI.    THE GOVERNMENT'S CASE

### A.    Estimated Length of Trial

The government anticipates that its case-in-chief will take approximately two weeks. The evidence in this case will consist of documentary evidence, witness testimony, and law enforcement testimony. A draft exhibit list is attached to this memorandum as Exhibit A. The government has also proposed various stipulations that should streamline the trial. A copy of these proposed stipulations is attached as Exhibit B.

## B.    Evidentiary Issues

### 1.    Hearsay exception: co-conspirator statements and documents

At trial the government will seek to admit verbal and written statements of the charged defendants, and of Remington employees who were co-conspirators who made these statements in furtherance of the conspiracy and scheme to defraud alleged in the indictment. Pursuant to Federal Rule of Evidence 801(d)(2)(E), statements by a defendant's co-conspirator made in furtherance of a conspiracy are admissible.   Such statements are admissible regardless of whether the person who made the statement is named in the charged conspiracy.   United States v. Turner, __ F.3d ___, 2013 WL 1811881, at **2, 3 (3d Cir. May 1, 2013).

The indictment alleges that the defendants and other Remington employees were engaged in a conspiracy that used Remington as a vehicle to defraud hundreds of people. Accordingly, the statements, both verbal and written, of the defendants and their co-conspirators are admissible at trial.

### 2.    Hearsay exception: Remington documents

At trial the government will also seek to admit a large number of Remington documents seized during search warrants executed in 2011, received from Remington victims, or acquired via subpoena to Remington and related companies.   These documents are admissible as admissions by the defendant made in furtherance of the scheme or conspiracy.   Fed. R. Evid. 801(d)(2)(E).   See also United States v. McGlory, 968 F.2d 309, 338 (3d Cir. 1992) (describing records of a drug business as "documents prepared in furtherance of a conspiracy"); Soc'y of Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co., 126 F.3d 727, 733 n.3 (5th Cir. 1997) (holding that documents written by sales representatives were admissible under Rule 801(d)(2)(D)).

### 3.    Hearsay Exception: Business Records

At trial the government will seek to admit bank records related to the Remington

fraud scheme.   These records are admissible under the business records exception to the general

hearsay prohibition.   Under the business records exception to the hearsay rule:

> A memorandum, report, record, or data compilation, in any form, of acts, events,
> conditions, opinions, or diagnoses, made at or near the time by, or from information
> transmitted by, a person with knowledge, if kept in the course of a regularly conducted
> business activity, and if it was the regular practice of that business activity to make the
> memorandum, report, record or data compilation, all as shown by the testimony of the
> custodian or other qualified witness, or by certification that complies with Rule 902(11),
> Rule 902(12), or a statute permitting certification, unless the source of information or the
> method or circumstances of preparation indicate lack of trustworthiness.   The term
> "business" as used in this paragraph includes business, institution, association, profession,
> occupation, and calling of every kind, whether or not conducted for profit.

Fed. R. Evid. 803(6).

### 4.    Summary Charts

The fraud in this case was enormous in scope, both in terms of the fraud loss, and

the number of victims.   The government intends to introduce into evidence, summary charts of

bank transactions and other financial evidence.   Under Federal Rule of Evidence 1006, summary

charts are admissible if they are based upon evidence that is: (i) voluminous, (ii) admissible and

(iii) available to the opponent.   United States v. Strissel, 920 F.2d 1162, 1163-64 (4th Cir. 1990).

Although much of the evidence underlying the government's summary charts will, in fact, be

offered for admission, it is not necessary that all of the evidence depicted in the charts be admitted

as long as it is otherwise admissible.   "It is well established that summary evidence is admissible

under Rule 1006 only if the underlying materials upon which the summary is based are

admissible." United States v. Hevener, 382 F. Supp. 2d 719, 729 (E.D. Pa. 2005) (citing United

States v. Pelullo, 964 F.2d 193, 204 (3d Cir. 1992)).

The government may also rely upon charts or summaries as educational devices. See Pierce v. Ramsey Winch Co., 753 F.2d 416, 431 (5th Cir. 1985) ("[I]t is critical to distinguish between charts or summaries as evidence and charts or summaries as pedagogical devices"). Under the rules, and even apart from Rule 1006, a trial court "has the discretion to permit the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence." Id.

### 5.   Conspiracy Evidence

The government hereby informs the defendant that government witnesses, including cooperating defendants, who will provide testimony against this defendant at trial, will testify about the length of time that they have known the defendant and their personal histories with the defendant.   The majority of this testimony will be about bad acts by the defendant that are intrinsic to the conspiracy – *i.e.* the acts to be described will be direct proof of the charged offenses or in facilitation of those offenses.   Summaries of government witnesses' testimony, including the testimony of cooperating defendants has been provided in discovery.

To the extent that the defendant's relationship with any government witnesses pre-dates the charged conspiracy, evidence of such a relationship is admissible under Rule 404(b), which permits the admission of evidence to show the pertinent background of the offenses, and to establish the relationship among the offenders.   United States v. Butch, 256 F.3d 171 (3d Cir. 2001), reaffirmed the principle, see United States v. O'Leary, 739 F.2d 135 (3d Cir. 1984), and United States v. Simmons, 679 F.2d 1042 (3d Cir. 1982), that, in a conspiracy case, 404(b) evidence may be introduced "to provide necessary background information, to show an ongoing relationship between [the defendant and a co-conspirator], and to help the jury understand the co-conspirator's role in the scheme." Id. at 1050.   The Court in Butch found that, relying on this principle, the district court had not abused its discretion in admitting evidence of prior thefts

25

committed jointly by individuals who later joined in a theft conspiracy.   256 F.3d at 176.[7]   See also United States v. Green, 617 F.3d 233, 247 (3d Cir. 2010) ("allowing the jury to understand the circumstances surrounding the charged crime – completing the story – is a proper, non-propensity purpose under Rule 404(b).").[8]

### 6.   Character Witnesses

Rule 405(a) allows only two methods of proving character reputation and opinion. Reputation evidence is from a person who knows the defendant's reputation in the community.   It is not the witness' own opinion, but his or her understanding of what the community thinks of the defendant.   Opinion evidence is the witness' own opinion about the defendant's character, which can come from a number of sources.   Fed. R. Evid. 405(a).

A witness called to testify regarding a person's character may not testify about specific instances of good conduct on direct examination. Id.   According to the Rule, however, "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct."   Id. Questions about specific instances of conduct, which would otherwise be impermissible, are allowed on cross-examination of a character witness for the purpose of testing the character witness's knowledge of the defendant's reputation in the community, or the witness's opinion of the defendant.

---

[7] Further, in a footnote, the Court stated that the district court could have also admitted the evidence of prior thefts under Rule 404(b) to prove the defendant's intent, given that he denied intentional participation in the crimes.   Id. at 177 n.5.

[8] In Green, where the defendant was charged with attempted possession of a kilogram of cocaine with intent to distribute, the Third Circuit held that a district court did not abuse its discretion in admitting evidence regarding the defendant's efforts to acquire dynamite in order to kill an undercover officer involved in an earlier case.   The efforts to obtain both cocaine and dynamite were discussed in the same recorded conversations, and therefore evidence of the threat to kill "was admissible as background information which completed the story of the crime." Green, 617 F.3d at 250.

The cross-examination permitted by Rule 405(a) includes prior bad conduct by the defendant.  As the Supreme Court noted in <u>Michelson v. United States</u>: "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him."  335 U.S. 469, 479 (1948) (cross-examination of character witness regarding year 20 year old conviction for violating the trademark laws and 27 year old arrest for receiving stolen goods permissible).  <u>See</u> <u>United States v. Evans</u>, 569 F.2d 209, 210 (4th Cir. 1978) (trial court did not abuse its discretion by allowing the prosecutor ask character witnesses whether they knew of the defendant's prior convictions for larceny, assault with a deadly weapon, and receiving stolen goods, and of his arrests for assault on a female, failure to stop for a police vehicle, and driving 110 miles per hour in a 55 miles per hour zone); <u>Government of Virgin Islands v. Roldan</u>, 612 F.2d 775 (3d Cir. 1979) (asking whether witness knew defendant had been convicted of murder permitted); <u>United States v. Lundy</u>, 416 F. Supp. 2d 325, 337 (E.D. Pa. 2005) (inquiry into charges which were dismissed or conduct for which a defendant was acquitted is proper).

Under Rule 405(a), the government may inquire into relevant specific instances of conduct to show the jury that the direct testimony about the defendant's good character paints an incomplete picture.  By pointing to instances of a defendant's misconduct, the government can discredit the defendant's character witnesses by showing that they are too biased or too uninformed to portray the defendant accurately.  Therefore, on cross-examination, courts have regularly permitted the prosecutor to ask the defendant's character witnesses if he has heard about, or if his opinion would be affected by, certain past instances of the defendant's misconduct, as long as the prosecutor has a good faith basis for his information.  <u>See</u> <u>United States v. Glass</u>, 709 F.2d 669, 673 (11th Cir. 1983).

Cross-examination of a reputation witness can include questions "about conduct, and even about charges, which may have come to the attention of the relevant community." See United States v. Curtis, 644 F.2d 263, 268 (3d Cir. 1981). These questions merely determine whether the information has come to the witness's attention. If the witness has not heard of specific acts inconsistent with his testimony for reputation, a jury may find the witness is too uninformed or the testimony is a fabrication. If the witness has heard of inconsistent acts and still believes the reputation is good, the jury may find that the witness's standard for good character is too low.

Cross-examination of an opinion witness should focus on what the witness knows and will test the accuracy of and basis for the favorable opinion. In Curtis, the Third Circuit noted that, when the character witness testifies to an opinion, "relevant cross examination is only that which bears on the fact or factual basis for formation of the opinion." In addition, because an opinion witness testifies as to his present opinion, inquiry into any specific instance of conduct up that moment when the opinion witness gives his testimony is permissible. See United States v. Furst, 886 F.2d 558, 577 (3d Cir. 1989).

Following this type of cross-examination, "the defendant is entitled to a limiting instruction to the effect that the prior bad act testimony does not bear on the defendant's propensity to commit such crimes again." Roldan, 612 F.2d at 781 (trial court did not commit plain error by failing to give an instruction where defendant did not request one). See also United States v. Apfelbaum, 621 F.2d 62, 64 (3d Cir. 1980) (emphasizing importance of limiting instructions).

The Court may limit the number of character witnesses, which is a common practice and has been held to be within the trial court's discretion. United States v. Gray, 105 F.3d 956, 963 (5th Cir. 1997) (affirming district court's decision to limit defendant to two character witnesses and noting that "[t]his court has repeatedly allowed a maximum of three character

28

witnesses"); United States v. Johnson, 730 F.2d 683, 688 (11th Cir. 1984) (affirming district

court's decision to limit number of character witnesses to three); United States v. Koessel, 706 F.2d

271, 275 (8th Cir. 1983) (affirming district court's limit of three character witnesses); United States

v. Henry, 560 F.2d 963, 965 (9th Cir. 1977) (district court did not abuse its discretion in limiting a

defendant to two character witnesses).

### 7.    The Defendant May Not Introduce Evidence of Specific Acts to Demonstrate Good Character or Negate Criminal Intent.

As noted above, under Rule 405(a), evidence concerning any specific acts the

defendant may have performed, no matter how laudable, is not admissible.   This is true even if the

witness is not designated as a character witness.   A defendant is not permitted to introduce

evidence of his or her own good behavior on other occasions to demonstrate a lack of criminal

intent during the commission of the charged crime.   See, e.g., United States v. Winograd, 656

F.2d 279, 284 (7th Cir. 1981) ("evidence that Siegel engaged in certain legal trades is generally

irrelevant to the issue of whether he knew of other illegal trades").   Therefore, the defendant

should be precluded from attempting to present evidence of any specific acts for which they may

have been commended, because evidence of good conduct is not relevant to negate criminal intent,

and is merely an improper attempt to portray a defendant as a person of good character through the

introduction of prior "good acts."   See United States v. Ellisor, 522 F.3d 1255, 1267 (11th Cir.

2008) (evidence of defendant's allegedly legitimate business activities was inadmissible in his mail

fraud prosecution because it did not bear on his intent to defraud with respect to the act in

question); United States v. Marrero, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that Marrero did

not overcharge in every instance in which she had an opportunity to do so is not relevant to

whether she, in fact, overcharged as alleged in the indictment.").   Testimony by others about the

defendant's good works is, in essence, improper character testimony concerning specific instances

of purportedly good conduct and should not admitted.

### 8.   Summary Witnesses

The government contemplates using government employees, including law enforcement officers, to testify as summary witnesses in connection with the presentation of much of the financial evidence described above.   Such testimony is properly admitted under Federal Rule of Evidence 1006 to describe the contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court.

### 9.   Recalling Case Agents to the Witness Stand

During the course of trial, the government plans to recall agents and investigators to the witness stand to address a number of different subjects.   While it would be possible for the agents and investigators to testify about several of these topics in a single appearance on the witness stand, such an unnatural constraint would not promote an efficient or clear presentation of the case.   Instead, the government proposes to recall them so that their testimony can be provided in parts, either by subject matter, or chronologically, as required for a clear and concise presentation of the case.

This procedure has been widely endorsed in complex conspiracy cases.   See United States v. Edelin, 128 F. Supp.2d 23, 47 (D.D.C. 2001) (collecting cases involving complex conspiracies or activities occurring over a long period of time that have approved of the practice of recalling witnesses to testify to discrete incidents; noting that Federal Rule of Evidence 611(a) authorizes the Court to control the order of interrogation and the presentation of evidence); see also United States v. Jackson, 549 F.2d 517, 528 (8th Cir. 1977) (praising the district court's exercise of its discretion as lending "a praiseworthy degree of order to this complicated trial"); United States v. Dimora, 843 F. Supp. 2d 799, 822-23 (N.D. Ohio 2012) (approving the recalling of a government witness because it will provide a clear and orderly trial and aid the jury's understanding of the

evidence).   Given the complexities of this case, the government submits that a similar procedure should be permitted here.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


DAVID L. AXELROD
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I certify that on this day I caused a copy of the Government's Trial Memorandum to be served by electronic filing and/or first-class mail, addressed to:

Lisa A. Mathewson, Esq.
The Offices of Lisa A. Mathewson LLC
123 South Broad Street, Suite 810
Philadelphia, PA 19109
*Counsel for Matthew McManus*

David L. Axelrod
Assistant United States Attorney

Dated: 1/6/14